**UNITED STATES of America,
Appellee,**

v.

**James MILLER, a/k/a Frank James
Coppola, Appellant.**

**No. 471, Docket 30989.**

United States Court of Appeals
Second Circuit.

Argued June 6, 1967.

Decided July 26, 1967.

W. Paul Flynn, New Haven, Conn. (Kopkind & Flynn, New Haven, Conn., Richard H. Simons, Milford, Conn., Steven B. Duke, New Haven, Conn., on brief), for appellant.

Jon O. Newman, U. S. Atty., Hartford, Conn. (William B. Butler, Sp. Atty., Dept. of Justice, Asst. U. S. Atty., Southern Dist. of Texas), for appellee.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

James Miller, a resident of Milford, Connecticut, was found by a jury in the District Court for Connecticut to have conspired to import heroin into the United States in violation of 21 U.S.C. §§ 173–74. The seriousness of the crime is attested by Judge Blumenfeld's sentence of 12 years imprisonment on a first narcotics conviction.

The indictment naming seven defendants was returned in the District Court for the Southern District of Texas on May 27, 1964. Judge Connally in that court granted Miller's motion for a severance on August 17, 1965, and, after initial denial by him of a motion for transfer of Miller's case to Connecticut pursuant to F.R.Cr.P. 21 and refusal of mandamus by the court of appeals, Miller v. Connally, 354 F.2d 206 (5 Cir. 1965), directed such transfer on February 18, 1966. The four other defendants who were arrested, Lucian Rivard, Charles Emile Groleau, Julian Gagnon (who went under the name of Jerry Massey) and Joseph Raymond Jones, have been convicted in Texas and their convictions affirmed. Rivard v. United States, 375 F. 2d 882 (5 Cir. 1967).

The appeal, rather unusual these days in that Miller claims he was innocent of the crime charged, raises what the Government has identified as twenty-five separate points; very likely there are even more. A summary of the evidence is essential to put them in proper focus.

I.

The Government's case, presented in the main through one Joseph Michel Caron, established a large-scale conspiracy to smuggle heroin into the United States in which a resident of the Bridgeport, Conn., area described by the participants as Frank or Frankie was an important cog. The tale begins with meetings between Caron, Massey, Jones and Rivard in and near Montreal in May and June 1963. Caron and Jones were initially to purchase new cars; Massey and then Jones went to Europe for supplies. In August Groleau instructed Caron that Massey was returning to Montreal by ship "with a load of white powder," and that Caron should case the pier for the presence of police and then meet Massey. The latter's car was unloaded from the ship, and the two drove to a nearby tavern at St. Austache; en route Caron saw

Rivard following in another car. Massey and Rivard entered the tavern while Caron guarded the car; Massey soon left the tavern, parked the car and told Caron it had 68 pounds of white powder which would be unloaded; still later Massey said that Caron was to take the load to some place in the United States. After a week or two, Caron was instructed that a Howard Johnson restaurant in Flint, Michigan, was to be the place; he received $700 as a fee and $88 for use of his car, a 1962 Chevrolet. The Flint expedition was cancelled at the last moment, and Caron and his wife took a pleasure trip to New York City instead. After an interval, Rivard and Massey gave a new designation, the Bridgeport Motor Inn. Massey loaded the Chevrolet with dope, and Caron and wife drove off for Bridgeport, phoning Rivard after crossing the border as instructed. On arrival at the Motor Inn, Caron registered as Mr. Robert and left the car with one door unlocked, his keys and registration in the ashtray, and a paper with his room number on the windshield. Shortly thereafter a man whom he identified as Miller came to his room with the keys and registration, said he could not take the car that day, and instructed Caron to put it in the parking lot and await orders. On the next day Miller phoned that he would be unable to unload then but that Caron should leave the car in the motel parking lot and await further instructions. The following morning he telephoned that would be the day.[1] Caron then unlocked one car door and left the keys and registration in the ashtray as before; around noon he noticed the Chevrolet was gone. Miller returned it during the afternoon and Caron perceived that a large bump in the back rest of the front seat had disappeared.[2] On Caron's return to Montreal, Rivard asked, "How is Frankie my friend?" Caron, who had not previously known the Bridgeport man's name, confirmed his good health and added that he had beautiful hair; Rivard responded that he was a hairdresser. In fact Miller was the proprietor of a chain of beauty shops.

In September Groleau instructed Caron to render the returning Jones the same services at the Montreal pier that he had performed for Massey. A contretemps occurred when Jones' car caught fire while being driven to a rendezvous with other conspirators. Jones confided that it contained 84 pounds of white powder he had obtained in France, and that Groleau had paid him $1700 for his efforts. Later Rivard told Caron he was to take Jones' load to the Bridgeport Motor Inn, after which he was to undertake journeys to France or Mexico City. Caron parked his car on a Montreal street and someone picked it up to transfer Jones' load. Later Rivard supplied him with funds and said he would "get in touch with the man in there, with Frank" and tell him "to make it fast" on this occasion and not consume three days as he had before. Caron was to follow the same procedure as on the first trip and was encouraged to take three children as well as his wife; Rivard thought "it looks better when you cross the border with your kids." Caron crossed the border around nine o'clock, phoned Rivard as instructed, spent the night in Albany, and reached the Motor Inn around noon on September 20. While the family was eating lunch at a nearby restaurant, Mrs. Caron noticed a man around the car. Caron went out, found Miller and another man, and gave Miller the keys and the registration. Later Miller entered the restaurant, where Caron had resumed his meal and had Caron join him for a cup of coffee. Miller advised that it would be too risky for Caron to come back—"two times is enough times"—and that he should tell Rivard to send him to Flint "next time." Caron, with Miller accompanying, drove his

1. He apologized for calling late, saying he had been up late the night before; Miller's uncle by marriage confirmed he had been with Miller until 1 A.M. that night.

2. On returning the car, Miller gave Caron $50 to defray the costs of the latter's three-day stay at the motel. Registration cards showed the dates of this trip to have been August 20–23.

Chevrolet about a thousand feet; the other man followed in a second car. Then Miller told Caron to alight and go back to the Motor Inn; the Chevrolet was returned later in the day and the Caron family departed for Montreal the following morning.

The final act begins with a meeting between Caron and Rivard to settle some financial matters at the "domaine ideale," a summer resort near Montreal owned by the latter. Rivard asked whether Caron wanted to go to Mexico City and, on receiving an affirmative answer, said he would get in touch. The order soon came; Caron was to go to the El Diplomatico Hotel on arrival in Mexico City, phone a man named Jorge, and utter a password. Rivard instructed on the technique of loading dope in the back rest and gave Caron the tools for surgery on the upholstery. Armed with these and $1200 expense money Caron and wife drove off. After the arrival in Mexico City there were many complications and telephone calls to Rivard to unravel them. Finally the Chevrolet was loaded by the local branch of the conspiracy and, on Rivard's instructions, Caron was given a piece of paper bearing the words "Stradford Motor Inn, Connecticut Exit 32," [3] along with instructions as to where and when to cross the border and to call Rivard to report success.

This time the plan miscarried. Caron's car was stopped on entering Texas at Laredo at 8 A.M. on October 10, and 76 pounds of heroin were removed from the back seat and panels. Between 2 and 6 A.M. on the morning of October 11 Miller and another man checked into the Luxor Baths on 46th St. in New York City, where Miller registered under the name of James Martin of Providence, R. I. The significance of the journey and of the use of an assumed name was heightened by Caron's testimony, developed on cross-examination, that Rivard had told him Frank "hung out" in New York City between 44th and 48th Streets.

Mrs. Caron corroborated her husband's testimony and identified Miller as the man she had seen on two occasions in Bridgeport. Many details, including Caron's phone calls to Rivard, were substantiated by independent evidence. Miller did not testify. The defense was an alibi, namely, that Miller was in his beauty salon at the times Caron placed him at the Motor Inn. Customers testified they were at the salon at the times indicated for their appointments but most of them were not under Miller's own care. Employees testified Miller never left the salon during the weeks of Caron's trips to Bridgeport. However, Miller's uncle by marriage, see fn. 1, contradicted this, saying that in August and September, 1963, Miller was out of the beauty parlor once and sometimes twice daily to supervise construction of another salon in a town 20 minutes away. This also was the time required to drive, at posted speed limits, to the Bridgeport Motor Inn.

### II.

■■ We have stated the evidence at this much length because the mere recital very nearly suffices to answer many of appellant's arguments. The claim that the Government proved only two isolated transactions against Miller and thus failed to show his membership in the conspiracy under the rule of United States v. Koch, 113 F.2d 982 (2 Cir. 1940) and similar cases is frivolous. It ignores such important facts as the large quantities involved, Miller's own statements about Rivard and Flint, Rivard's inquiry concerning "Frank," and the clear evidence of prearrangements. Experienced counsel should not burden the court by repeating the statement, discredited both in logic and in law, see United States v. Nuccio, 373 F.2d 168, 173 (2 Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967), and cases cited, that it is the defendant's "words and acts alone which reveal whether he joined a conspiracy." How counsel can serious-

3. This is less than four miles from Exit 36 of the New England Thruway leading to Milford, where Miller's principal place of business was located.

ly urge "the absence of evidence that narcotics were delivered to the defendant or that defendant knew he was receiving narcotics" since "the evidence connecting defendant to a conspiracy is as consistent with a conspiracy to deal in diamonds, gold, geodetic maps, stolen securities or any other contraband as it is with a conspiracy to traffic in narcotics," passes understanding. Frivolous also is the claim that venue as to Miller was improperly laid in the Southern District of Texas since the "Mexican" conspiracy was allegedly separate and apart from any that Miller was proved to have joined. There was ample evidence that Mexico was an alternate source of supply for the large scale operation in which Bridgeport Frank was an important participant; indeed, it is fairly inferable that the shipment of heroin intercepted at Laredo was destined for him. We turn therefore to the claims that Miller was prejudiced by matters occurring before and during the trial and by errors in the charge.

### III.

█ The first claim is that a fair trial was prevented by the prejudicial publicity given to Miller's arrest on June 19, 1964. This occurred about noon, at his beauty shop in Milford, simultaneously with the arrest of his four co-conspirators in Montreal. The arrests were publicized in the New York Daily News of Saturday, June 20, under the colorful headline "NAB 2 TYCOONS, BUST WORLD DOPE RING No. 1" and in the Bridgeport Sunday Herald of June 21 under the equally loud banner "RAIDERS CHARGE: MILFORDITE FED DOPE TO N. Y. UNDERWORLD." Both articles evidenced extensive communication from the Government. The Daily News article described appellant as "Frank James Coppola, a 37-year-old ex-convict who masqueraded as a legitimate businessman in the swank Connecticut suburbs where he lived and worked" under "the legally changed name of James Joseph Miller"; in fact the proof at the trial showed that Miller was appellant's name and Frank Coppola an alias as we shall see.

The News quoted "the authorities" as saying that heroin "was funneled" through Coppola to New York, Chicago and other major cities throughout the United States, a charge made in the indictment only in much more general terms and not proved at the trial save for the evidence as to Miller's occasional trips to New York. The Bridgeport Herald article said that "a Milford beauty parlor operator has been described by Federal authorities as the key cog for the New York underworld in an international narcotics ring which operated across the Mexican and Canadian borders"; the indictment had not specifically charged Miller with being "the key cog" and the proof later offered hardly supported so extreme a statement. The article said that "Frank J. Coppola, alias James Miller, is listed in a Federal indictment handed down May 27 as the operator of a 'pick up' point for a multi-million dollar smuggling ring in Milford and as a major distributing agent for heroin brought into Connecticut." The article erred both in repeating the indictment's incorrect transposition of Miller's true name and the alias and in quoting words not actually contained in the indictment. The article also said that "a good portion" of the narcotics seized at Laredo "was earmarked for the Milford drop for a New York pickup," and that "while none of the bulk heroin left with Coppola was handled by pushers in Connecticut, authorities said it undoubtedly seeped back to state 'contacts' via New York underworld sources."

We have previously indicated our disapproval of the Government's stimulating the type of publicity concerning important federal arrests in Connecticut which appears to have been somewhat in vogue during 1964. United States v. Costello, 352 F.2d 848, 852 (1965), cert. granted on another point, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 205 (1966), see also Marchetti v. United States, 385 U.S. 1000, 87 S.Ct. 698, 17 L.Ed.2d 540 (1967); United States v. Grassia, 354 F. 2d 27, 29 (1965). Attorney General Katzenbach took an effective step to pre-

vent such abuse in the Statement of Policy issued on April 17, 1965, 28 C.F.R. § 50.2, and we commend the code on this subject for police and law enforcement agencies recommended by The Special Committee on Radio, Television and the Administration of Justice of the Association of the Bar of the City of New York chaired by our colleague, Judge Harold R. Medina, Freedom of the Press and Fair Trial 32–35 (1967). See also American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press 5–8 (Tent. Draft 1966). However, the stories here in question appeared in New York and Bridgeport papers in June 1964, whereas the trial was in Hartford in May and June 1966. When questioned, only five veniremen said they had read of the case, and their references were not to the cited articles but to announcements that the trial was starting. Appellant's point that these answers lacked some of the significance claimed by the Government since they were in response to the judge's asking about "the last time" the prospective jurors had heard or read about the case is blunted by the fact that the court did not stop there but conducted a thorough voir dire into the veniremen's preconceptions concerning the defendant's guilt, to which none responded affirmatively; and the defense failed to request a more searching inquiry. Neither can we accept Miller's contention that a Hartford jury was necessarily prejudiced by single New York and Bridgeport reports of two years before, see generally Comment, "Free Press-Fair Trial" Revisited: Defendant-Centered Remedies as a Publicity Policy, 33 U.Chi.L.Rev. 512, 523–26 & n. 73 (1966); as we observed in United States v. Grassia, supra, 354 F.2d at 29, "Criminal defendants are understandably prone to exaggerate the interest their fellow citizens take in matters of such acute concern to them." Miller expressed no desire for a further postponement or preference for any place of trial other than Hartford and the statements were a long way from the level that might prevent trial at any time or place. Although appellant asserts also that the newspaper accounts of the crime impaired his ability to obtain witnesses to assist in his defense, we cannot believe that the excess of the articles over what would have been a proper report of the indictment and arrest, which is all that Miller can legitimately complain about, could have had this effect, or were sufficiently likely to have had it to entitle him to a hearing on that issue.

■■ The next contention is that the Government's failure promptly to make Caron's Chevrolet available for investigation and its placing the car in Government service deprived Miller of evidence essential for his defense. The specific claim is that examination of the car shortly after Miller's arrest on June 19, 1964 might have revealed the absence of his fingerprints or the presence of those of some other denizen of Bridgeport nine months before, or have negated the carriage of heroin in the back rest of the front seat.[4] Miller's counsel first sought, by a letter addressed to an Assistant United States Attorney in Houston, to inspect the car on September 9, 1964; the record does not inform us what happened thereafter save that a motion for inspection was first made in July 1965 and was promptly granted.

Common sense tells us that the chance of finding useful fingerprint evidence nearly a year after the event was minimal and nothing in the record undercuts this conclusion. Nor is there any evidence that if an examination of the back of the front seat to negate carriage of heroin in August and September 1963 would have been fruitful in September 1964, it would not have been in August 1965, and Caron's testimony as to cuts in the upholstery presumably could have been checked at that time. Moreover,

4. The shipment loaded in Mexico City was under the rear seat and in the panels, the Mexico loaders having failed to comply with Caron's instructions to load the car as before.

while Caron's transportation of heroin to Bridgeport was an issue in the sense that in a criminal trial everything is, the proof on that subject was exceedingly strong and the only issue really contested was whether Miller was Bridgeport Frank. Realization of all this may have accounted for counsel's waiting ten months between his request of the United States Attorney to inspect the car and his motion in court for that relief. We thus find nothing to indicate that the Government deprived Miller of evidence relevant to his defense.

## IV.

Extended argument is made as to the indictment's naming appellant as "Frank James Coppola alias James Miller" and a related incident at the trial. While his case was still in Texas, Miller moved that the words "Frank James Coppola alias" be removed from the indictment; he offered birth, marriage, military and other records to show that his name had always been James Miller or James Joseph Miller. The motion was denied both in Texas and, on renewal, in Connecticut. However, at the start of the trial the court read to the jury array the style of the case, comprised of the names of all seven alleged conspirators including "Frank James Coppola alias James Miller," and pointed out, "The only defendant who will be tried here today in this case is the defendant James Miller. The Court has been informed that the defendant's name is James Miller alias Frank James Coppola." Furthermore, appellant was referred to as James Miller throughout the trial and in the charge, and although the Government made point of the alias in its summation it did not argue that Coppola was defendant's true name and Miller a mere alias. While Caron's testimony showed that the Bridgeport member of the conspiracy was known to his fellows as "Frank" or "Frankie," it did not include a surname. In defendant's case much was made of the fact that since early childhood he was always known as James Miller. To con-

tradict this the Government in rebuttal offered a fingerprint card from the files of the F.B.I. The card bore the typewritten name and signature of Frank Coppola, the photograph was that of Miller, and an expert identified the fingerprints as his.[5] The card was made out in Wilkes-Barre, Pa., where appellant, then 24 years old, was arrested in 1948 for petty larceny; the Government offered to mask the portion of the card indicating the arrest but defense counsel declined and objected to the offer *in toto*. The judge admitted the card, instructing the jury to disregard any information on it other than that relating to identity.

While it would have been better physically to correct the indictment to transpose the reference to Miller and Coppola, the judge's instruction to the jury array took sufficient care of that matter. Appellant cites United States v. Monroe, 164 F.2d 471, 476–477 (2 Cir. 1947), cert. denied, 333 U.S. 828, 68 S. Ct. 452, 92 L.Ed. 1113 (1948), and United States v. Grayson, 166 F.2d 863, 867 (2 Cir. 1948), as condemning the use of aliases in indictments. But the disapproval expressed in those opinions is limited to cases where the alias is without relevance; indeed, Judge L. Hand in *Grayson* emphasized that there, "No issue could come up as to Grayson's identity, and an alias—even a single alias— can serve no purpose." In this case without the alias the Government would have been confronted with the point that while the indictment charged James Miller, the proof other than the identification related only to "Frank." See United States v. Valenti, 74 F.Supp. 718 (W.D.Pa.1947); United States v. Melekh, 193 F.Supp. 586, 595 (N.D.Ill.1961). Furthermore, it is significant that in *Monroe,* which presented a context not dissimilar to the one here, the conviction was affirmed; and Judge Hand in *Grayson* said that the use of the alias, even when considered together with another minor error at trial, "would not in our judgment even remotely tend to justify a reversal."

---

5. No evidence as to identity of handwriting was offered.

■ As to the fingerprint card, the Government was entitled to offer it in its direct case, and we perceive no prejudice to appellant from its having withheld the card until his own presentation gave added emphasis to the question of name. While appellant loudly asserts that the card was inadmissible hearsay, he fails to explain why it was not receivable as a record kept in the regular course of business, 28 U.S.C. § 1732(a). The judge was warranted in thinking the probative value of the evidence far outweighed whatever prejudice may have come from disclosure of an arrest for a minor crime in 1948—a disclosure which the Government offered to prevent although defense counsel's refusal of the offer is understandable. While in one sense the card was remote, its proof that appellant had been using the name Frank Coppola so many years ago, indeed shortly after leaving the Navy, had its own significance in indicating that Miller had long been leading a double life.

## V.

■ The next point deserving comment is the criticism of the Government's being permitted to supply proof of the details as to how after his arrest Caron had identified Miller as the man he had seen on both visits to Bridgeport. The opening statement of Miller's trial counsel made it clear that identification was the central issue in the case; he asserted that federal officials were "looking for a person in the Bridgeport area," that to that end they "enlisted the services of one Sergeant Maroney of the Connecticut State Police" who had a personal grudge against Miller, and that the Government had "purchased" from the Carons, with more than $5000 in cash spent for the upkeep of Mrs. Caron and the children and ten to twenty years in freedom from prison sentences, testimony that it knew to be fabricated and "tailored to fit the individual produced by Sergeant Maroney." Caron underwent a five-day cross-examination which developed his lengthy criminal record, the fact that no charge whatever had been placed against his wife and none against him for the Bridgeport crimes, and his hope for pardon or commutation of sentence on the charge of smuggling heroin from Mexico to which he had pleaded guilty and been sentenced in 1964. It developed also that shortly after his arrest he had given customs agents a description of Frank and the other man seen in Bridgeport; that later he had been shown some photographs including Miller's; that, while saying these looked like Frank, he had been unwilling to make a positive identification from photographs alone; and that he was then taken to Milford, was not completely sure of his identification on his first sight of Miller who was too far away, but became certain on seeing him again the next day.

The Government then called various witnesses to describe just how the identification had been made. Richards testified that on October 16, 1963, Caron gave a detailed description of the man with whom he had had dealings in Bridgeport; the judge instructed that this was to be considered solely as showing how the investigation had begun and not as affirmative proof identifying Miller. Richards continued that later eight to ten photographs of other persons and three of Miller in different poses were shown Caron who picked out the photograph of Miller saying, "This looks like him, but I can't be sure. I would like to see him in person." Cross-examination brought out that Caron had also been "fairly sure" that photos of another man were of Frank but with the reservation that the subject was "somewhat heavy to be Frank." The Government next called Fallon, a customs agent from the New York office whose territory included Milford, Conn. He testified he had received the description given by Caron and sent photographs of Miller, these being the only ones he had requested by name. He also corroborated Caron's testimony as to the identification in Milford in February, 1964, as did William J. Demlong, a Connecticut state policeman. Defense counsel cross-examined Fallon concerning Sergeant Maro-

ney, explaining to the court in presence of the jury, in response to an objection of irrelevancy, "It's relevant to my opening statement, that John Maroney is the person responsible for this man being picked out." Fallon testified that he had not met Sergeant Maroney until November 19, 1963, some weeks after Caron's identification of Miller's photographs. Murphy, another customs agent, testified to taking a photograph of Miller on November 1, 1963, apparently as a result of a request for a full-length photo to resolve Caron's doubts as to whether the photograph of one other than Miller represented Frank. Finally Frederick A. Rody, Jr., special assistant to the Commissioner of Customs, negated a suggestion made in the cross-examination of Fallon that Caron had identified the photograph of still a third man as Miller.

Even if Caron had not been impeached, the Government was not forced to rely on his identification of Miller in open court but could have brought out the details of his positive identification in Milford by his own testimony and also by that of others corroborating his version of the details. See United States v. Forzano, 190 F.2d 687 (2 Cir. 1951); Bolling v. United States, 18 F.2d 863 (4 Cir. 1927); Eidson v. United States, 272 F.2d 684 (10 Cir. 1959).[6] Compare United States v. Wade, 388 U.S. 218, 239–242, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. State of California, 388 U.S. 263, 269–274, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). We need not consider how far this same principle permitted proof of earlier observations of photographs, see United States v. Reed, 376 F.2d 226 (7

Cir. 1967); that subject was opened by the defense's cross-examination of Caron, and the Government "was not bound to let the defendant bring out only what he pleased and be content itself with no more." Vause v. United States, 53 F.2d 346, 352 (2 Cir.), cert. denied, 284 U.S. 661, 52 S.Ct. 37, 76 L.Ed. 560 (1931); see also Cohen v. United States, 157 F. 651, 656 (2 Cir.), cert. denied, 207 U.S. 596, 28 S.Ct. 261, 52 L.Ed. 357 (1907); United States v. Pugliese, 153 F.2d 497 (2 Cir. 1945). The sole item subject to criticism was the Government's developing from Fallon that the only photograph he had requested by name as meeting Caron's description was Miller's. Since, as appellant argues, the jury might have taken this to mean more than it said, namely that after reading Caron's description Fallon was of the opinion that Miller was the guilty party, the Government ought not to have asked that question. However, defense counsel objected only on the score of hearsay. Since the valid objection was rather that Fallon's opinion was incompetent, the judge was warranted in resting on the general instruction given when the line of testimony began; moreover, it was scarcely a surprise to the jury that the Government had been suspicious of Miller from the outset.[7]

## VI.

When the trial was in its fourth week, the deputy clerk advised the judge that someone had talked to a juror about the case at a social gathering. The judge immediately brought the matter to the attention of counsel; defense counsel requested him to make inquiry without

6. See 4 Wigmore, Evidence § 1130 (1940 ed.): "This is a simple dictate of common sense, and was never doubted in orthodox practice. That some modern Courts are on record for rejecting such evidence is a telling illustration of the power of a technical rule of thumb to paralyze the judicial nerves of natural reasoning."

7. Still on the subject of identification, much is made of the defense's inability to interview the two oldest Caron children, the court having taken the position that

this was for their legal guardian to decide but having also made clear that compulsory process for their testimony would issue upon request. While the Government is doubtless bound not to obstruct a defendant's access to a prospective witness, we know of no rule requiring the witness to submit to an interview. Moreover the jury would scarcely have been impressed if the children (the oldest of whom was then ten), who had seen "Frank" only for a moment while eating lunch, had been unable to identify him three years later.

counsel being present and suggested that this be deferred for a short time until the taking of evidence was concluded and that the juror be cautioned in the meanwhile not to discuss the matter. When the judge spoke to the juror, it was discovered that he had already mentioned the incident to two others, like him residents of Litchfield, Conn., with whom he drove to court; the judge instructed him not to discuss it further and to give similar instructions to the two other jurors.

After the taking of evidence had ended, the judge called the three jurors into his chambers. The juror reported that a man serving drinks at a cocktail party had said, "I'm just going to warn you that another man in Litchfield told me that when this is over, that unless you're very careful that there is a bunch in Torrington who are going to get after you and beat you up. They don't want to kill you, but they don't like what is going on." After pointing out that such a remark might have been intended either to intimidate a juror or to cause him to stiffen up, the judge inquired whether it would affect the decision of any of the three. All answered in the negative and assured the judge that no other jurors knew of the incident. The juror to whom the remark had been made then said he thought one of the others "should mention something about that place over there." This juror said there were two places in Torrington where his grandsons reported dope was being sold. He added "that doesn't affect me any, only to the extent I have grandsons, and so forth," the suggestion apparently being that the judge should bring the matter to the attention of the authorities in order to stop further sales. On further questioning this juror affirmed, "It has nothing to do with me. I will say it the way I see it." On returning to court the judge denied a defense motion for a mistrial.

 While the incident was unfortunate, as was that in United States v. Borelli, 336 F.2d 376, 392 (2 Cir. 1964), cert. denied, Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), and the communication was more troublesome than the ringing of the juror's telephone in United States v. Gersh, 328 F.2d 460, 462–463 (2 Cir.), cert. denied, Mugnola v. United States, 377 U.S. 992, 84 S.Ct. 1919, 12 L.Ed.2d 1045 (1964), there was nothing like the probability of prejudice present in Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956). The juror in that case conceded he had "been under a terrific pressure" from the combination of an offer of a bribe and an interview by the F. B. I. which "whatever the Government may have understood its purpose to be" had not "dispersed the cloud" created by the offer. 350 U.S. at 381, 76 S.Ct. 425. Here there is no basis for doubting the ability of the three jurors to exercise the fair judgment they promised. The only way in which the judge might have handled the matter better would have been by interviewing the jurors individually as he had indicated he would, since this would have somewhat reduced the risk of a juror's being unwilling to admit susceptibility to extraneous influence. However, we cannot regard the joint interview as a misuse of the wide discretion accorded him. While the written motion for a new trial complained that the opportunity to cross-examine the three jurors was not granted or afforded defense counsel, that had been expressly waived in favor of inquiry by the judge. At the argument on the motion defense counsel referred to his attempts to interview the jurors, their consulting an attorney, and a suggestion by someone, presumably the attorney, that any interviews be held in abeyance pending an order from the judge; he sought a two week adjournment to permit such interviews. The judge declined to grant this and denied the motion for a new trial. We find no error in this. The case is entirely different from Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), where the trial court apparently did not even interview the juror in question and the record did not show "what actually transpired"; as the

later opinion made clear, 350 U.S. at 379–380, 76 S.Ct. at 427, "It was the paucity of information relating to the entire situation coupled with the presumption which attaches to the kind of facts alleged" that "made manifest the need for a full hearing." Here the judge had developed the facts by interrogating the jurors, with counsel agreeing not to be present; there was thus no occasion for subjecting the jurors to a further inquiry. Cf. United States v. Crosby, 294 F.2d 928, 949–50 (2 Cir. 1961), cert. denied sub nom. Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L. Ed.2d 523 (1962); United States v. Dardi, 330 F.2d 316, 332 (2 Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed. 2d 50 (1964).

### VII.

■ A veritable broadside of attacks is levelled at the charge, many of which, like some other points we have not discussed, go beyond the bounds of fair argument in their distortions and partial quotations. Only two require comment.

From opening statement through cross-examination to summation defense counsel properly hammered on Caron's expectation of a pardon in return for his cooperation with the Government. Caron freely admitted this. He testified that shortly before giving evidence at the Texas trial he told a Department of Justice attorney that he "was going to apply to the Pardons Attorney in Washington for executive clemency"; that the Department of Justice attorney and at least two customs agents promised to back him up; that the attorney had confirmed this only a month before the Connecticut trial; and that his application was currently pending before the Pardon Board. The judge's charge on this subject is quoted in the margin.[8] In the course of defense counsel's exceptions there occurred a colloquy which we also reproduce.[9]

The judge's charge was accurate save in the particular that pardons are handled not by a "Board" but by the Attorney General on the recommendations of the Pardon Attorney who reports through the office of the Executive Assistant to the Attorney General, 28 C.F.R. Part O (Subpart G) and Part 1 (1967). The judge had not indicated "that the Pardon Board is not a part of the Department of Justice," as defense counsel mistakenly recalled, but only that the pardoning

8. "Now, if you find that the Government has purchased the testimony of Mr. or Mrs. Caron with gold or with liberty, with extra favor, either given or promised to him, you will acquit this accused. I mean such conduct would not only be reprehensible but it would be unconstitutional. So, if you find that to have been the case, you acquit the defendant.

"On the other hand, if you do not find that the Government purchased or agreed to pay the Carons for testifying against the defendant you will, of course, disregard the claim completely.

"There isn't any doubt that some in the Government organization have indicated a belief, or at least some judgment, that Mr. Caron does deserve some consideration on an application for a pardon. Well, I don't know what all the nuances of that are and neither do you, I guess, except to what appear here.

"What appeared is that he, as a relatively minor cog in this operation, did tell the whole story. But this determination, whether or not he is entitled to any consideration which might fit in with those considerations that the pardon authority takes into account, is for the Pardon Board. Nobody in the Department of Justice, Criminal Division, has any authority whatsoever to release anybody who has been sentenced to a term of imprisonment by a Judge of the Federal Court. If there is any commutation or alleviation of that sentence it has to be done by the prison authorities through the Pardon Board."

9. "Mr. Flynn: Your Honor indicated that the Pardon Board is not a part of the Department of Justice. I respectfully except to that comment by the Court and suggest that the Pardon Board is a subsidiary office of the Attorney General of the United States.

"The Court: Well, all right.

"What about that, Mr. Newman? What about that?

"Mr. Newman: Your Honor's remark, as I heard it, was that the pardon office is not part of the criminal division, and that is correct.

"The Court: All right."

authority was independent of the Criminal Division. If the defense had wished it made clearer that recommendations for executive clemency were transmitted to the President by the Attorney General on the recommendation of a Pardon Attorney in the Department of Justice, there is every reason to believe the judge would have done so. Moreover, Caron's testimony had made it altogether clear that he had been assured of the backing of the Criminal Division staff in his plea to the Pardon Attorney. We cannot agree with appellant that the jurors would have been "most surprised to learn that less than a month after the trial" Caron's sentence was commuted to expire at once; on the contrary, the testimony left no doubt that Caron would have been unpleasantly surprised if, after two years' incarceration, it had not been.[10]

■ Miller had requested a charge that his failure to testify did not create any presumption against him, and that the jury must not permit such failure to weigh in the slightest degree against him or allow it to enter into the discussion or deliberations in any manner; the judge inadvertently failed to give this as promised, although he had instructed as to the presumption of innocence and the Government's burden to overcome this by evidence beyond a reasonable doubt. After completing his charge, the judge told the jury that it might proceed to consider the case but that, while its consideration was going on, he would entertain exceptions to the charge and recall the jury if any corrections or additions were to be made. After hearing counsel the judge announced he would supplement his charge in some particulars including this one; he said he would try to frame the instruction in a way that would avoid any adverse emphasis from its being given in a supplemental charge after twenty minutes' deliberation. He was eminently successful in doing this, both by a general instruction that the jury was not to consider that he meant the matters in his supplemental charge to receive "any extra emphasis" and by his adept phrasing of the particular charge requested. While we do not regard the practice of allowing the jury to begin its deliberations pending the hearing of exceptions to the charge as desirable, no one objected at the time, and it is too late to do so now.

We have considered defendant's other claims of error but deem it unnecessary to discuss them. In fact we fear that the length of this opinion, written in deference to Miller's claim of innocence, and the identification of a few points where, with the advantage of ample time for reflection, we have thought some other course might have been preferable, may give a false impression of this trial. As we said in United States v. Kahaner, 317 F.2d 459, 485 (2 Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963), "Absolute perfection in trials will not be attained so long as human beings conduct them." Judge Blumenfeld had the hard task of presiding over a trial that was protracted and often was made more heated by defense counsel than it

---

**10.** Caron testified that among the things he listed on his application for clemency as worthy of the Pardon Officer's consideration was his testifying "for the Government in this case," and that one reason he agreed to testify was his "hope * * * [to] get out of the penitentiary." He admitted that he was going to ask the Government to send him to a trade school in consideration of his cooperation in testifying, and that customs agents "said they are going to find me a job and hide me some place in the United States." The assistant matron of the county jail in Galveston, Texas, where Caron was confined during the Texas trial, called as a defense witness, testified Caron had said he would have to serve a little over three years if he didn't come up to Connecticut and identify the man who was to be tried there but that he would have to serve "approximately ninety days at the most" if he did, and was then going to be sent to a "butcher school." She also told of having mailed to Attorney General Katzenbach a letter written by Caron with the assistance of a Department of Justice attorney, and of Caron's saying "he would get out in approximately ninety days if that paper went through * * *."

need have been; he discharged his difficult duties with patience and with skill. Here, as in the cited case, we hold that the issue of defendant's guilt "was placed before the jury in a manner that was fair and in accord with applicable rules of law."

The judgment of conviction is affirmed.