UNITED STATES of America
v.
James MILLER.
Crim. No. 11191.

United States District Court
D. Connecticut.

Nov. 26, 1968.

Jon O. Newman, U. S. Atty., Hartford, Conn., for the United States.

W. Paul Flynn, New Haven, Conn., Richard H. Simons, Milford, Conn., Steven B. Duke, New Haven, Conn., for James Miller.

## RULING ON THIRD AND FOURTH MOTIONS FOR NEW TRIAL

BLUMENFELD, District Judge.

In June 1966 James Miller was found by a jury to have conspired to import heroin into the United States in violation of 21 U.S.C. §§ 173, 174, largely on the basis of testimony by one Joseph Michel Caron. Again the defendant in two separate motions, each denominated "Amendment to Motion for New Trial," filed while an appeal from the denial of one filed and heard earlier is pending, presses for a new trial on several grounds. His first motion for a new trial was filed promptly after the verdict on the ground that extraneous communications to three jurors contaminated the verdict. The denial of that motion was affirmed in the same opinion that affirmed Miller's conviction. United States v. Miller, 381 F.2d 529, 538–540 (2d Cir. 1967), *cert. denied,* 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968). The second motion for a new trial was denied, 277 F.Supp. 200 (D. Conn.1967), and an appeal from that decision is pending. The third motion for a new trial, based on essentially the same grounds as was the first one, was filed February 27, 1968. A hearing and ruling on that one was deferred, pending the outcome of an appeal from an order enjoining the defendant and his attorneys from conducting interviews of the jurors. 284 F.Supp. 220 (D.Conn.1968). That ruling was affirmed on October 9, 1968. 403 F.2d 77 (2d Cir. 1968). The fourth motion was filed on August 30, 1968. In it the defendant again claims that instead of Miller, one Mario Natalizio was the guilty party, and also that significant evidence to impeach Caron was suppressed. Although filed later in time, this fourth motion will be considered first.

### I.

Miller reiterates his contention that Joseph Michel Caron, one of the government's principal witnesses at the trial,

made a mistake in identifying Miller as the pick-up man to whom he made two separate deliveries of large quantities of heroin secreted in an automobile he had driven to Bridgeport, Connecticut, from Montreal. On the second motion for a new trial, the defendant offered two writings signed by one Mario Natalizio purporting to be confessions that he, not Miller, was the pick-up man in Bridgeport. Upon all the facts, fully elucidated in 277 F.Supp. 200, the court found that the "confessions" were neither newly discovered nor credible.

What was introduced at this hearing simply overlaps, in widening spirals, what was offered before to corroborate the contention that Natalizio was in Bridgeport during the periods when the deliveries were made. There was no direct testimony that Natalizio was in Bridgeport on the specific dates, August 22 and September 21, 1963, let alone at the motel where the deliveries took place. One of the defendant's witnesses, Daniel LeFemine, managed the apartment building in North Miami Beach where Natalizio lived. He testified that in July 1963 Natalizio, after saying that he and another man were going North to make a "score," left and returned a month later.[1] There is other evidence that Natalizio flew to Philadelphia with LeFemine's son about Labor Day 1963, from where they went to New York by train. About that time LeFemine drove his son and Natalizio to Bridgeport, letting them off at Natalizio's house in Bridgeport. All this is too remote to establish that Natalizio was actually present at the time and place of the deliveries. It is even less persuasive of the contention that Miller was not.

In an attempt from another angle to link Natalizio to the Bridgeport transactions, the defendant produced Roger Beauchemin, a courier for the conspirators who delivered an automobile containing heroin to Flint, Michigan, in July 1963. After viewing several photographs, he identified Government's Exhibit 2, a photograph of one Frank Altese, not Natalizio, as one of the pick-up men he saw at Flint, Michigan. Whether Sal Giglio, whose photograph he identified as the other man he saw at Flint, was also present when the second delivery was made by Caron to the defendant at Bridgeport is still questionable. But assuming that Giglio was the third man at Bridgeport, in the absence of any link between Natalizio and Giglio at Flint, there is no basis in Beauchemin's testimony for inferring that Natalizio was with Giglio at Bridgeport at the critical times and places.

The presence of Natalizio in Bridgeport at certain vague times in September of 1963 and his activities there in connection with an attempt to obtain some motel registration records was considered in the second motion. 277 F.Supp. at 204. Nothing in the additional testimony introduced at the hearing on this motion causes me to doubt that Miller was the pick-up man.

Miller's contention that it was not he, but Natalizio, who took the deliveries, even if based on facts which would permit an inference a notch above speculation or conjecture,[2] ignores the reality of Mrs. Caron's testimony at the trial,[3] in addition to that of her husband. Taking into account the conclusiveness with which Miller's identification was established at the trial, see 277 F.Supp.

1. On cross-examination LeFemine testified that his earlier denial in 1965 to government agents that Natalizio had left the Miami area during July, August and September 1963 was a lie.

2. I have refrained from discussing the elaborate details concerning the criminal proclivities of certain underworld characters with whom Natalizio was said to have been seen talking. Just because he may have been seen with them cannot establish anything above a suspicion that he may have been involved in the transfers of narcotics at Bridgeport. Compare Sibron v. New York, 392 U.S. 40, 68, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (Douglas, J., concurring) ; United States v. Cappabianca, 398 F.2d 356, 360 (2d Cir. 1968).

3. See also Affidavit of Jon O. Newman, October 8, 1968, ¶2.

at 202, and tested on appeal, *see* 381 F.2d at 537–538, the showing on this motion is still far short of what would probably produce an acquittal at a new trial. *See* Brown v. United States, 333 F.2d 723, 724 (2d Cir. 1964).

## II.

Implicit in the challenge to the identification of Miller at trial is an effort to undermine the credibility of Joseph Michel Caron, a principal identification witness. Several lines of attack are pursued.

## A.

The claim is again made that Caron's testimony that Lucien Rivard told him that "Frank," the pick-up man in Bridgeport, was a hairdresser must have been a lie.[4] On the earlier motion the defendant contended, "If Rivard made the statement, therefore it was a lie." 277 F.Supp. at 210. Now a reason asserted for the contention that it was a lie is that Caron did not tell the government's investigators about it until long after he had been arrested. The mere fact that the conversation initiated by Rivard about Miller did not appear in any statement taken by government investigators until Mr. William Butler, then the Assistant United States Attorney for the Southern District of Texas, made a note of it when questioning Caron during the preparation for the trial of Miller's co-conspirators in the Southern District of Texas does not establish that Caron had not mentioned it before.[5] Caron testified to this fragment of conversation at the trial in Texas. That was in September 1965 before the Miller case was tried.

Obviously it was open to the defense at Miller's trial to question Caron as to when for the first time he had told anyone about this conversation. Even if it had not been related earlier by Caron, many explanations other than deliberate falsification could account for the delay. What effect his answers might have had upon his credibility would have been for the jury.

## B.

From another side, the defense offers the affidavit of Lucien Rivard that he did not know, never had seen, nor had any dealings with Miller under that name or any other name, nor that he had any conversation with Caron about Miller. Rivard's statement is not credible. A few months before, while serving a sentence for his own participation in this international conspiracy, see Rivard v. United States, 375 F.2d 882 (5th Cir.), *cert. denied sub nom.* Groleau v. United States, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967), Rivard claimed that he had nothing to do with narcotic smuggling. Affidavit of Fenelon A. Richards, Oct. 8, 1968. I attach no credit to Rivard's affidavit. I find it unworthy of belief.

## C.

In a shift from an attempt to give him the direct lie, the defendant advances the claim that Caron was induced to conjure up the incident of his conversation with Rivard about "Frank" being a hairdresser. This is a two-stage argument, one of which requires consideration of an extraordinary incident which occurred on February 4, 1966, between the Texas

---

4. Caron testified at the trial that when he met Rivard in Montreal after the first trip to Bridgeport, the following was part of their conversation: "Well, thats when I find out this man['s] name was Frank and he also said to me—that I mention to Rivard that he had beautiful hair, so Rivard said he was a hair dresser." Tr.A 255. Throughout this opinion, "Tr.A" will refer to the transcript of the trial; "Tr.B" will refer to the transcript of the hearing on the fourth

motion for a new trial; "Tr.C" will refer to the transcript of the hearing on the third motion for a new trial.

5. At this hearing Mr. Duke testified that when he interviewed Caron under hypnosis in May 1968 he asked him why he waited *so long to make a statement* about Rivard's hairdresser remark. Caron insisted that he had made that statement from the very beginning, after his arrest, in Laredo. *See* Tr.B. 668–69.

trial of Miller's co-conspirators and the Hartford trial of Miller. It came about in this way. During an interview of Caron by the government's attorneys shortly before the Rivard trial (September 1965) Caron mentioned that he had observed the license number of the automobile he saw being used by Miller and a companion at the time of the second delivery at Bridgeport. At the time this was of no significance for the trial of Rivard, but might be of considerable importance at the trial of Miller.

When a motion to transfer the trial of Miller's case to Connecticut was granted in February 1966, Mr. Butler thought that it would be advisable to see and talk to Caron, to insure his continued cooperation as a witness. He did not attempt to go over the entire case with Caron, but did ask him whether or not he had been able to remember the license number on the car that was at the Bridgeport Motor Inn at the time of the second delivery in Bridgeport. As recorded by Mr. Butler in a memorandum a few days later:

> "Caron stated that all he could remember was that the plates were yellow and black and part of the number on the plates was the number 26. This was the first time I had received any indication that Caron could recall any part of the numbers. Since I have a slight knowledge of hypnotism, I had previously given consideration to the use of hypnotism to try to obtain information in this case. Because what I know of hypnotism indicates that it can be useful in bringing back memories from a subconscious mind that can not be brought out of the conscious mind, I asked Caron whether he would be willing to submit to hypnotism to see whether he could recall the license plate. He readily agreed to do so."
> Memorandum of William B. Butler, annexed to defendant's motion, at 3.

### The Interrogation under Hypnosis

The full report of the interrogation of Caron under hypnosis is set out in Mr. Butler's memorandum annexed to the defendant's motion. In brief, Caron was hypnotized by Mr. Edward B. Cushing, a qualified expert in hypnotism. Caron went into a trance fairly quickly, but was taken out of it when he began to show signs of distress after being questioned about some aspects of the case. After a rest, Mr. Cushing attempted to hypnotize Caron again, but failed. Mr. Butler took over and got Caron into a "medium and possibly even a fairly deep state of hypnosis." Caron was questioned about the events in Bridgeport, while under hypnosis, from at least "the early part of his second trip." The session continued for some two hours. Mr. Butler then gave Caron a post-hypnotic suggestion and "brought him out of hypnosis."

That afternoon, following a nap and shave, Caron was hypnotized again by Mr. Cushing and went into "a medium and possibly a deep state fairly quickly." He was then interrogated by Mr. Butler and Mr. Cushing about some of the events in Bridgeport, and both Cushing and Butler gave Caron "some post-hypnotic suggestions designed to make it easier for him to endure his incarceration." The specific purpose of the questioning of Caron under hypnosis was to get him to recall a single, isolated fact— the license number of the automobile he had seen.[6] No details relevant to the identification of Miller as one of the men at the scene were discussed. If the presence of "Frank" was mentioned, it was only to encourage Caron to focus on the automobile near to which he stood.

The defendant refers to the effect of the hypnosis incident in allegations of the fifth paragraph of his motion, asserting that because of

" * * * the combination of lengthy incarceration, repetitive questioning, emotional distress, neurotic reactions, ego involvement with the identifica-

6. Apparently the information obtained about the car came to naught because its identity was not established at the trial through Caron.

tion, suggestive employment of photographs and the absence of a lineup, the hypnotizing, hypnotizability, and suggestibility of Michael Caron:

"a) Caron's testimony that Rivard said that 'Frank' was a 'hairdresser' was a fabrication;

"b) Caron's identification of James Miller was virtually worthless and completely unreliable;"

The difficulty with using any of the *content* of the hypnosis incident to establish that Caron's testimony concerning the Rivard conversation is a "fabrication" is that the hypnosis came after the revelation of this conversation, and thus could not have been used to "implant" the conversation in his mind. Notwithstanding, the defendant contends that the mere *fact* that Caron was hypnotizable, coupled with other experiences he underwent, establishes the "fabrication." This leads to the second step in the defendant's argument.

### Hypnotizability as a Credibility Factor

The defense produced Dr. Herbert Spiegel, a psychiatrist who testified that the hypnotizability of Caron, as established by his hypnosis, enabled him to conclude that Caron would go into a "non-formal" trance [7] under prolonged interrogation. Therefore, he continued, when Caron was questioned at length on each of three alternate days [8] by the United States Attorney and two assistants in the course of their preparation for the impending trial of Rivard, Caron must have gone into at least a light trance. Then, by taking into account all of Caron's frustrations and emotional stresses attributable to his existing and future incarceration, the separation from his wife and children, and other possible social and sensory deprivations, Dr. Spiegel gave it as his opinion that the subject, Caron, would be so suggestible under the prolonged interrogation "that he would say almost anything, and give that as a gift (to his interrogator) if it promises a relief of the pressure." By a "gift" the psychiatrist meant "an answer that will satisfy the interrogator." Although the form of the "gift" could be shaped in response to a direct implant of it, or even from a "cue" received from the interrogator, the absence of either an "implant" or a "cue" did not affect the opinion of the psychiatrist that "Mr. Caron's testimony that Mr. Rivard told him one of the men in Bridgeport is a 'hairdresser' was a fabrication." [9] He based his conclusion on his opinion that during Caron's incarceration and interrogation by government agents, he was considerably more suggestible and more easily hypnotized than persons under normal conditions. While the foregoing is but a mere sketch of the testimony and affidavits of psychiatrists submitted by the defense, it is sufficient to raise the question whether objective truth finding is to be shifted from the courtroom to a psychiatrist's office.

■ It is not my purpose to pronounce judgment on the question whether the credibility of a witness can be scientifically determined. Although the theory of Dr. Spiegel is novel and news-

7. One in which his critical judgment would be more accessible to him than when he was normally hypnotized.

8. On the basis of this thorough interrogation, a guide for the interrogation to be made of Caron at the Rivard trial was made jointly by Mr. Butler, Mr. Jackson, and Mr. Seals. Its use to the defendant as a Jencks Act statement was denied by the court at the trial of Miller. A copy of it was made a sealed court exhibit at that trial, and the propriety of the denial was upheld on appeal. The original has been furnished to me, with copies to counsel, since the hearing on this motion. It and the transmittal letter have been marked Government's Exhibit 3. The reference to the conversation in which Rivard said that Frank was a hairdresser appears on p. 2a.

9. *See also* Affidavit of Dr. Herbert Spiegel, Aug. 22, 1968, and Affidavit of Dr. Jay Katz, Aug. 30, 1968, annexed to defendant's motion.

worthy, see Time, May 24, 1968, at 59–60, it is not yet a consensus of the scientific community that there is a relationship between hypnotizability and credibility. On the same assumptions made by Dr. Spiegel about Caron in this case, Dr. John Donnelly, the chief psychiatrist at the Institute of Living in Hartford,[10] found no basis for reaching an opinion that Caron's testimony was a fabrication. I do not accept the elaborate explanation of defendant's experts that the one word "hairdresser" from the mouth of Rivard spoken in response to Caron's remark that Miller had beautiful hair was Caron's fictional creation of a "gift" for his interrogators.[11] It was not established in this case that there is a way to determine scientifically whether this was a reaction formulation or an unchanged recollection of an original experience. I have not the slightest doubt that the conversation with Rivard was not an unconscious fictional creation of Caron's. Even if the defendant's experts were permitted to testify to an opinion of a witness' credibility, but cf. Washington v. United States, 129 U.S. App.D.C. 29, 390 F.2d 444 (D.C.Cir. 1967), such opinion testimony about this one item of evidence would not probably impeach Caron's credibility, much less result in an acquittal.

This brings me to two points which must be developed in considering the testimony of defendant's expert, shorn of his opinion of Caron's credibility. First, the failure to disclose the content of the hypnosis episode insofar as it may have been a *repetition* of Caron's earlier statements does not justify a new trial.

Both psychiatrists were in agreement that the repetition by Caron of a statement previously made by him would serve to impress that statement more firmly in his mind. Repetition as a method of learning lines is not a new idea. While it is true that the government did not disclose that Caron had been hypnotized, the content of that episode could have had, at best, only a minimal effect on Caron's recollection of his conversation with Rivard. The conversation was not mentioned. His attention was directed to what happened during the second trip to Bridgeport. This was later in time than his conversation with Rivard. The whole thrust of the episode was to concentrate Caron's attention on a few moments in Bridgeport when he observed the numbers on the registration plates of a car.

Turning next from what Caron said to what he was, the hypnosis of Caron established that he was hypnotizable. To the extent that one is hypnotizable, he is also suggestible. Most people are hypnotizable to some degree. According to Dr. Spiegel, about 80% of the population are hypnotizable; and a little less than 100,000,000 people in America are hypnotizable to the same extent as Caron.[12] Tr.B. 380–81. According to that standard, Caron was far from being basically unstable. This is not a case like United States v. Hiss, 88 F.Supp. 559 (S.D.N.Y.1950), where it was held that psychiatric testimony of insanity or mental derangement was admissible to impeach the credibility of the government's key witness. Indeed, none of the evidence presented even suggested that

10. A private, non-profit psychiatric hospital of 400 beds with out-patient beds and facilities and a day treatment center, a clinic research center and teaching programs.

11. While there is relation between "beautiful hair" and "hairdresser," the matching signal came from within the mind of Rivard. Rivard's response did not corroborate Caron's physical description of Miller. It introduced an entirely new dimension of Miller's character—his occupation. It would take the skill of a playwright to express the idea—in the form of a dialogue *and in another language*—that Frankie of the beautiful hair was a hairdresser. Caron's linguistic difficulties at the trial clearly revealed that he had become bilingual only recently. No other example of this sort of versatility in Caron appeared during the trial or since.

12. Neither data to support the estimate of numbers hypnotizable, nor standards by which to measure the degree of hypnotizability, were offered.

Caron was neurotic, psychotic, schizophrenic, or was in any sense suffering from any mental disorder. Compare United States v. McFarland, 371 F.2d 701 (2d Cir. 1966), *cert. denied*, 387 U.S. 906, 87 S.Ct. 1689, 18 L.Ed.2d 624 (1967). There would not seem to be any reflection on the credibility of a witness because he stands in the middle ground between the most and least suggestible of 160,-000,000 suggestible people in a society of 200,000,000. *Cf.* Jury Selection and Service Act of 1968, Pub.L. No. 90–274, 82 Stat. 53.

Finally, although the government did not disclose to the defense that Caron had been hypnotized it did not deliberately suppress that information. Until the issue was pressed on this motion, there was no reason for the government attorney to believe that the episode could be of any value to the defense, even for impeachment purposes. *Cf.* United States v. McFarland, *supra*. The government's sole purpose was to extract "back memories" of the numbers on an automobile registration plate, a purpose diametrically opposed to an implantation of something into Caron's mind. The failure of the government to disclose that Caron was normally suggestible could not have affected the jury's determination of Caron's credibility. *Cf.* United States v. Keogh, 391 F.2d 138, 147–48 (2d Cir. 1968); United States v. Tomaiolo, 378 F.2d 26, 28 (2d Cir. 1967); Kyle v. United States, 297 F.2d 507, 514 (2d Cir. 1961).

### D.

### *The Suicide Gesture*

Although Mr. Butler was served with a subpoena duces tecum commanding him to bring the prison records of Caron pertaining to attempted suicide, he had been unable to obtain them before this hearing was completed. They have now been filed with the court, copies have been served upon defense counsel, and the parties have been afforded an opportunity to file briefs relating to this evidence.[13]

Mr. Butler denied that any of government's counsel knew of the existence of any such records or of the matter contained in them. Certainly the records were not suppressed.[14] No request for them was ever made until long after Miller was convicted. These contain no medical opinion that Caron's threats of self-destruction and his acts to emphasize them constituted a genuine attempt to commit suicide. However, it is not necessary at this stage to pursue this medical question further. Caron's suicide gestures while in custody were known to the defense at the trial. On the fifth day of trial, while Caron was under cross-examination, he was asked:

"Haven't you told some officials * * at Sandstone,[15] and also told Miss West that you would rather kill yourself than to do what they were trying to get you to do up here in Connecticut, to testify? Haven't you?

Answer: "Yes, I think I did." (Tr. A 837–38).

This was a sufficient revelation to the defense that Caron displayed suicidal tendencies while incarcerated to negate both the claim that such evidence is newly discovered and the claim that it was suppressed. The records would have served no purpose other than to embellish or repeat facts otherwise known to the defense. Cf. Giles v. Maryland, 386 U.S. 66, 98, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) (Fortas, J., concurring). No re-

---

13. These records have been markd Government's Exhibit 4.

14. Before trial the government did furnish defendant's counsel with a letter written in French by Caron to his wife which prison authorities had intercepted and photostated. In that Caron wrote that all his testimony in the Rivard trial had been a lie, including his testimony about Frank (Miller). Caron was exhaustively cross-examined about this letter and the extremely upset emotional state which prompted him to write it.

15. The federal correctional institution in Minnesota where Caron was incarcerated at the time.

quest for the prison records was made before or during the trial.[16]

### III.

■ Broadly viewed, all of the evidence presented in support of this motion was in existence at the time of trial, and by exercise of reasonable diligence was discoverable before trial, excepting only the hypnosis incident. With the significance of that limited to proof of Caron's suggestibility, it too, is only cumulative. The issue to which the evidence is mainly directed is the credibility of one phase of Caron's testimony, his identification of Miller. The new evidence to impeach Caron is only cumulative, and flimsy as such. It does not persuade me that Caron lied, wittingly or unwittingly, in any of his testimony identifying Miller. And I am fully satisfied that the evidence submitted on the present motion, taken alone or together with that introduced on the earlier motion for a new trial, would not probably have resulted in an acquittal, if introduced at the trial. *Cf., e.g.,* Mesarosh v. United States, 352 U.S. 1, 9, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956); United States v. Rutkin, 208 F.2d 647, 654 (3d Cir. 1954); United States v. Johnson, 142 F.2d 588, 592 (7th Cir.), *cert. dismissed,* 323 U.S. 806, 65 S.Ct. 264, 89 L.Ed. 643 (1944); United States v. Frankfeld, 111 F.Supp. 919, 923 (D.Md.), *aff'd sub nom.* Meyers v. United States, 207 F.2d 413 (4th Cir. 1953). In reaching this conclusion, I do not lose sight of the fact that cross-examination to elicit the truth and to expose falsehood was skillfully and rigorously exercised upon Caron over several days of the trial. The interrogation of Caron by the government's attorneys before the trial, the dimensions of his tragic situation, all of the frustrations suffered because of his incarceration, the enforced separation from his wife and children, the promises he sought to elicit from the government, what the government did for him and his children, what its representatives promised to do for him, his conduct throughout his participation in the conspiracy and thereafter, his earlier background in criminal activities, his motives, his power of memory, his situation with respect to the parties, his suicide gestures, and more, were all severally scrutinized and examined. This resulted in an efficacious exposure of the various facets of Caron's personality— his suggestibility included—to the jury. *Cf.* 5 Wigmore, Evidence § 1367. Perhaps present counsel might have tried the case differently, but the issue of Caron's credibility would have been the same, and it is apparent that the tactics and evidence to impeach it would be largely the same. A review of the record of the original trial leaves me convinced of the correctness of the jury's verdict.

The fourth motion for a new trial is denied.

### *The Third Motion for New Trial*

In this motion, the defendant renews his earlier contention that an extraneous communication to three jurors during the course of the trial impeached their verdict. This court's holding that the

16. The facts of this case do not fall within the scope of Giles v. Maryland, *supra.* That case was rife with evidence bearing on the credibility of the principal prosecution witnesses, all of which was deliberately suppressed: (1) an undisclosed police report substantially at variance with the testimony of the rape complainant and the investigating police officer on significant aspects of the case; (2) evidence relating to nymphomania of the complainant; (3) a suicide attempt which followed within a matter of hours a subsequent affair with two boys at a party, followed by the filing and later dropping of rape charges against them. The Supreme Court did not regard those as necessarily errors of constitutional magnitude, only as worthy of consideration by the Maryland Court of Appeals on the question of whether to grant a new trial. Whatever lapse from complete disclosure existed in this case had no untoward effect upon the fairness of the trial Miller received. "A defendant is entitled to a fair trial but not a perfect one." Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953).

communication and the circumstances surrounding it, as set forth in the margin,[17] did not constitute jury prejudice was affirmed in United States v. Miller, 381 F.2d at 538–540. Pending action by the Supreme Court on the defendant's petition for certiorari, the defendant and his attorneys employed Miss Virginia Samon, a skilled investigator, to interview all of the members of the jury. On being informed of this, the court issued an order to show cause why the defendant and his counsel should not be enjoined from further interrogation of the Miller jurors. The defendant filed the present motion on the heels of the court's order to show cause. A hearing on the show cause order resulted in an injunction. 284 F.Supp. 200, aff'd,[18] 403 F.2d 77 (2d Cir. 1968). The court thought that deferring a hearing on this third motion might conceivably result in the saving of time because of the pendency of the petition for certiorari.[19] It was also noted, 284 F.Supp. at 229: "It is not clear whether the scope of the Amendment to Motion for New Trial extends beyond what was before the Court of Appeals for decision in United States v. Miller [381 F.2d at 538–540] or is merely an attempt to explore the jurors' reaction to the extraneous communication in greater depth."

At this hearing on the motion the defendant offered nothing new. He moved for subpoenae to the three jurors who knew of the communication already ruled upon. He also submitted an "Offer of Proof in Support of Motion for Depositions of Jurors." Counsel stated that his offer of proof could be fulfilled only by further interrogation of the jurors, and that that was where he expected to obtain the evidence. What he proposes is nothing more than a rehash of contentions made in his earlier opposition to being enjoined from further interrogation of the jurors. It is apparent that he seeks to question the jurors with respect to their reactions to the communication and whether they had heard any gossip about the size of the fee defendant's trial counsel had received. Counsel offers no explanation for his persistent disregard for the rule that jurors' reactions to external communications cannot be probed, particularly in the face of Judge Friendly's complete exposition of its rationale in United States v. Miller, 403 F.2d 77 (2d Cir. 1968). Neither of these subjects of further inquiry can be regarded as "significant new objective facts." See id. nn. 11 & 12.

The burden was on the defendant to come forward with proofs to sustain the allegations of his motion. He offered nothing except a repetition of what has already been considered in the show cause proceeding which culminated in the injunction.

The only objective evidence received was introduced by the government. That was the testimony of Mr. Heck, the heretofore unnamed man who made the remark to the juror, Mr. Lester, which lies at the root of the defendant's claim of jury prejudice. It turns out that what Mr. Heck said to Mr. Lester was even

---

17. A juror reported that a man serving drinks at a cocktail party at the home of a friend said, "I'm just going to warn you that another man in Litchfield told me that when this is over, that unless you're very careful that there is a bunch in Torrington who are going to get after you and beat you up. They don't want to kill you, but they don't like what is going on." 381 F.2d at 539. The juror reported it to two others with whom he rode to and from court every day.

18. Treating an appeal from the injunction as a petition for mandamus or prohibi-

tion, the injunctive order was permitted to stand unaltered.

19. On January 8, 1968, counsel for Miller had filed a copy of Miss Samon's Affidavit of Dec. 27, 1967, concerning her interviews with the jurors, with the Supreme Court in support of the application for certiorari. This was prior to the hearing on the order to show cause and the making of the present motion. Certiorari was denied on June 17, 1968. 392 U.S. 929, 88 S.Ct. 2273 (1968).

more innocuous under the circumstances than what Mr. Lester told two of his fellow jurors and reported to the court.

The elaboration of the circumstances by Mr. Heck reveals that he has worked for a Mr. Thompson, of Litchfield, for the past 33 years, acting as chauffeur, gardener and houseman. One night, while preparing and serving a drink for Mr. Lester, who was a guest of the Thompson's at a small cocktail party, they exchanged greetings and some small talk which informed Heck that Lester was on jury duty in Hartford on a case that was "internationally involved." Because it seemed unusual to Heck when Lester replied affirmatively to his question, "Do they let you come back and forth every night?" Heck commented: "Gee, you never can tell, if its that much involved. Gee, they might pick you up half-way home, or on the road, or you can never tell what they'd do with you. I don't know whether they'd kill you or not, but you never know what they'd do with you." Tr.C 16. That ended the conversation as Mr. Lester took his drink and walked out of the room.

What Mr. Heck said was just his own idea, gathered as he explained, "You read how they do it in other cases so maybe they'd try it in this, I don't know. That was just my idea." Tr.C 25.

It is obvious that this was nothing more than speculation by Mr. Heck, who had known Mr. Lester for a long time and wanted to manifest some concern for him. Rather than a rumor of a sinister threat, it was simply cocktail gossip. It had no relevance to the defendant. It did not emanate from any third person, and Heck's hypothetical "they" was not "a bunch in Torrington" as Mr. Lester imprecisely reported to the court. But no matter which version is the true one, the legal requirements for a new trial on the ground of jury prejudice are not present in this case. 381 F.2d at 538–540.

The third motion for a new trial is denied.