Evelyn M. **HARTFORD**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant (two cases).**
**Nos. Civ. 3608, C–65–61.**

United States District Court
W. D. Wisconsin.
Jan. 17, 1967.

William F. Krueger, Wausau, Wis., for plaintiff.

Mitchell Rogovin and D. J. Dinan, Tax Division, Dept. of Justice, Washington, D. C., Edmund A. Nix, U. S. Atty., Madison, Wis., for defendant.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

In 3608–Civ. plaintiff is suing to recover allegedly overpaid income taxes for the years 1955–57. The Internal Revenue Service assessed deficiencies in the respective amounts of $5,800.45, $880.67 and $751.94 for these years. These assessments were paid on May 31, 1961, together with interest accrued to that date in the additional amounts of $1,779.-05, $218.06 and $140.21.

In C–65–61 plaintiff is suing to recover allegedly overpaid income taxes for the years 1960–62. On October 8, 1964, deficiency assessments in the respective amounts of $778.05, $1,260.97 and $976.-40 were paid together with interest in the additional amounts of $142.99, $156.-08 and $62.27.

Plaintiff thus claims that she is entitled to the sum of $9,570.38, with interest thereon at the statutory rate from May 31, 1961, and the additional sum of $3,376.76, with interest thereon from October 8, 1964. These two cases were consolidated for trial by stipulation and have been tried. This court has jurisdiction under 28 U.S.C. § 1346(a) (1).

The tax returns involve both the present plaintiff and her husband, George, who died on July 6, 1963, during the pendency of 3608–Civ. It has been agreed that Evelyn Hartford may prosecute these actions as the sole party plaintiff.

During all of the years involved in these cases, the Hartfords owned real estate in Vilas County, Wisconsin, bordering on Carlin Lake. This real estate included substantial acreage and a clubhouse or lodge with dining and recreation facilities and sleeping accommodations for about thirty. During the years in question this lodge, together with its equipment and furnishings, was leased by the Hartfords to The Carlin Club, Inc. The Carlin Club, Inc., is a nonprofit Wisconsin corporation which was estab-

lished to operate a private resort known as The Carlin Club. The lease, which was renewed each year in substantially the same form, provided that the Hartfords would receive as rent $2,500 per year, plus the first $7,500 of the net income of the club each year.

On his tax returns for the years in question, George Hartford deducted from his adjusted gross income various amounts for depreciation of the clubhouse, for insurance on the clubhouse, and for legal expenses in connection with the clubhouse. Plaintiff's principal contention is that these deductions were proper as "ordinary and necessary expenses paid or incurred during the taxable year * * * for the management, conservation, or maintenance of property held for the production of income * * *." Int.Rev.Code of 1954, § 212.

It appears to be conceded that these deductions were ordinary and necessary expenses incurred with respect to the management, conservation, or maintenance of the property leased to The Carlin Club, Inc. The government contends, however: (1) that for the purpose of Section 212, "income" means an excess of receipts after expenses, and that there was no such income here; and (2) that the property was "held for" a purpose other than the production of income.

## I.

■ . The government argues that the terms of the lease from Hartford to The Carlin Club, Inc., made it virtually impossible for Hartford to receive any income from the transaction. While practical factors restricted the maximum possible rental under the lease to $10,000, the necessary expenses connected with the leased premises, it is contended, would always exceed $10,000. Therefore, Hartford could never realize "income" if income is defined as an excess of receipts over expenses.

I cannot agree that in Section 212 Congress intended such a restricted meaning of "income." Rather the word should be taken to mean an inflow of money or gross receipts. The Code is replete with

instances in which the expression "taxable income" is used when it is desired to refer only to receipts remaining after deduction of expenses. See, e. g., §§ 63, 161.

■ The Government cites no authority to support its view that "income" in Section 212 is to be accorded the narrow range suggested. In William C. Horrmann, 17 T.C. 903 (1951), however, the taxpayer was in possession of a house too large and expensive for his use. During several years when the taxpayer did not live in the house and was trying to rent or sell it, he deducted depreciation and upkeep expenses from his adjusted gross income. The court held (907–908):

"But when efforts are made to rent the property as were made by petitioner herein, the property is then being held for the production of income and this may be so even though no income is in fact received from the property, Mary Laughlin Robinson, 2 T.C. 305, and even though the property is at the same time offered for sale."

If property held vacant and unrented is property held for the production of income, property actually rented may be property held for the production of income.

In Mary Laughlin Robinson, 2 T.C. 305 (1943), depreciation and upkeep expense deductions were allowed on a vacant building which could not be rented.

Treas.Reg. § 1.212–1(b) provides:

"Similarly, ordinary and necessary expenses paid or incurred in the management, conservation, or maintenance of a building devoted to rental purposes are deductible notwithstanding that there is actually no income therefrom in the taxable year, and regardless of the manner in which or the purpose for which the property in question was acquired. Expenses paid or incurred in managing, conserving, or maintaining property held for investment may be deductible under section 212 even though the property is not currently productive and there is no likelihood that the property will be sold at a

profit or will otherwise be productive of income and even though the property is held merely to minimize a loss with respect thereto."

I conclude that the narrow interpretation urged for the word "'income" as used in Section 212 is not correct.

## II.

■ The government's second contention is that the property was "held for" a purpose other than the production of income, even if income may be defined as gross receipts rather than as an excess of receipts over expenses. The contention appears to rest on two grounds: (1) that it is inherently improbable that one would hold property for income over a period of years if the receipts were failing to match the expenses; and (2) that there is affirmative evidence that the property was held for the purpose of establishing an entirely separate distinct business, namely, bottling drinking water for table use.

George Hartford lived and was engaged in business in Chicago until his retirement in 1954. In 1943 he had purchased the land on Carlin Lake, and he planned to build a home there for his retirement. Commencing in about 1949 he began to consider the possibility of a commercial business consisting of bottling and marketing for table use waters drawn from a well at Carlin Lake. Commencing at about the same time, he began to consider the possibility of a formation of a club with clubhouse and recreational facilities at Carlin Lake.

Construction of a clubhouse began in 1952 and was substantially completed in 1954. The Carlin Club, Inc., was incorporated in Wisconsin in 1954 for the purpose of operating the clubhouse and recreational facilities. The first lease of the property from the Hartfords to The Carlin Club, Inc., was for a period commencing July 1, 1954. Meantime, from about 1949 until a time which is in dispute (plaintiff contends for October, 1955), George Hartford explored the physical, technical, and financial possibilities of the water bottling business,

and made efforts to interest Chicago associates in investing in it. The water bottling business never came into being. In February, 1956, George Hartford suffered a severe stroke which left him seriously disabled, both physically and mentally.

The issue here concerns the relationship between the building of the clubhouse, the formation of The Carlin Club, Inc., and the leasing of the property by the Hartfords to The Carlin Club, Inc., on the one hand, and the organizational plans for the water bottling business, on the other hand. There is no question whatever that such a relationship existed. I find that a major purpose for the construction of the clubhouse, the incorporation of the club, and the leasing of the clubhouse to the club was to exploit the possibilities for the water bottling business by bringing to the site of the water potential purchasers, distributors and investors in the contemplated water business. I find, however, that a related purpose for the leasing arrangement, specifically, was to obtain a return on the Hartfords' investment in the clubhouse. I find that from the time George Hartford suffered his stroke in February, 1956, the practical possibility of organizing the water bottling business terminated. I find that by the autumn of 1955, the practical possibility of organizing the water bottling business appeared to be slight.

Thus, it is clear that during the taxable years involved in this lawsuit (1956, 1957, 1960, 1961, and 1962), the purpose of holding the property was not that of establishing the water business. With respect to the taxable year 1955, the purpose of holding the property was a mixed purpose: (a) as an aid in organizing a water business; and (b) as a source of income from rentals.

Obviously the 1955 situation is less clear than that in the succeeding years. However, the nature of the specific expenses for which deductibility is here claimed must be considered. They are not such usual promotional expenses as travel, advertising, telephone charges,

and postage. They are depreciation on the clubhouse, insurance premiums on the clubhouse, and legal services related to the clubhouse. These are expenses which may more fairly be attributed to the club as a project, without regard to the prospects of the water business, than to the water business project, without regard to the prospects of the club. It is significant, too, in terms of evaluating whether the total picture reflects a scheme for tax evasion, that the clubhouse was a substantial facility and that substantial charges were made for membership in the club and for the use of the facility.

The circumstances also dispose of the suggestion that it is inherently improbable that one would hold property for income over a period of years while receipts failed to match expenses. It is not an unusual practice to seek a moderate rental for the first few years in leasing a business property, and then to raise the rental when the business (in this case, the club membership and patronage) has become more profitable. George Hartford's illness, coupled with his wife's lack of business and promotional skills, is a sufficient explanation of the failure to increase the rental during these years.

I conclude that the disputed expenses were ordinary and necessary expenses paid or incurred during the taxable years 1955, 1956, 1957, 1960, 1961, and 1962, for the management, conservation, and maintenance of property held for the production of income, within the meaning of Section 212, and that the deductions for them should have been allowed.

I also conclude that any rentals received by taxpayer during these years pursuant to the lease of the clubhouse to The Carlin Club, Inc., should be included as income.

I make no specific finding concerning the net operating loss carry-back deduction of $1,467.27 claimed in 1955. The nature and composition of this item was not explained. It may be that this item will no longer be in dispute following this decision.

Defendant is hereby ordered to recompute plaintiff's tax liability for the years 1955–57 and 1960–62 in conformity with this decision, and to submit such recomputation to plaintiff for her approval within twenty days of the date of this decision. The plaintiff is ordered to submit to the court a proposed form of judgment to which the parties have agreed. Should the parties fail to agree, plaintiff may move for judgment in a form submitted by her, and the matter will be heard and determined by the court.