**UNITED STATES of America**

v.

**James MILLER.**

**Cr. No. 11191.**

United States District Court
D. Connecticut.

Nov. 21, 1967.

Jon O. Newman, U. S. Atty., Hartford, Conn., for the United States.

W. Paul Flynn, Steven B. Duke, New Haven, Conn., Richard H. Simons, Gerald I. Stevens, Milford, Conn., Percy Foreman, Houston, Tex., for defendant.

### RULING ON MOTION FOR NEW TRIAL

BLUMENFELD, District Judge.

The defendant moves for a new trial on the ground that newly discovered evidence reveals that the government witness Michael Caron made a mistaken identification. At the trial, only obliquely did the defense question the fact that two separate loads of narcotics had been delivered to a man in Bridgeport. The dominant issue was whether that man was the defendant James Miller. His defenses were an alibi and mistaken identification. After hearing extensive evidence, the jury resolved both factual issues against him and found him guilty of conspiracy to smuggle heroin into the United States in violation of 21 U.S.C. § 174. The case was vigorously defended at trial and exhaustively prospected for error on appeal. The conviction was affirmed. United States v. Miller, 381 F.2d 529 (2d Cir. 1967).

The defendant now comes forward with evidence that one Mario Natalizio has confessed to being the man to whom the deliveries of heroin were made. As indicated, the identification of that man as Miller at the trial did not go unchallenged. A substantial portion of the trial which extended through every trial day of May 1966 was devoted to undermining the identification of Miller by Caron, the courier who delivered the

heroin at Bridgeport, and by his wife, who accompanied him to Bridgeport on both trips. The defense in a cross-examination of Caron which lasted seven days resorted to all of the generally used methods for attacking Caron's credibility in great detail. He was questioned about his prior criminal conduct;[1] his making of knowingly false statements; the existence of bias on account of promises by the government to assist him in obtaining a pardon (he had been sentenced to ten years imprisonment in Texas), because of money paid by the government toward the support of his wife and young children in this country, and the government's grant to him of admission to the United States as a permanent resident; and more. The circumstances under which he made his pre-trial identification of Miller were thoroughly probed. See United States v. Miller, 381 F.2d at 537–538. It was also suggested that a Connecticut state policeman had contrived to have Miller identified to satisfy a personal grudge against him.

From another aspect at trial, the defense suggested that Caron was mistaken; that the "Frank" to whom he said he made the deliveries was some other Frank. They suggested it was Frank LeChien (Tr. 690–695) or Frank Musial (Tr. 3242–3256). It introduced a mug shot and police record of the latter into evidence, but on rebuttal the prosecution proved that Musial was safely in jail when the deliveries were made. This brief exposition of the extent to which the identification issue was litigated at the trial will serve as a background against which the defendant's motion for a new trial should be considered.

■ The rule is that when a motion for a new trial is based on newly discovered evidence, the moving party must satisfy the court that the evidence is newly discovered, that it was unknown to the defendant at the trial and that such absence of knowledge was not due to any lack of diligence on the part of the defendant. Being "new" as so tested is not enough. The evidence must also be material, not merely cumulative or impeaching—such that it will probably produce an acquittal. Berry v. State, 10 Ga. 511, 527 (1851); cf. United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958). Motions for new trials are not favored and should be granted only with great caution. United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

These several aspects from which the evidence should be considered must be examined more fully.

The principal item of evidence offered is a written confession in the handwriting of Mario Natalizio.[2] In fact, there are two different versions of a confession, each on two sheets of paper, and each sheet dated July 12th. Three pages were signed by Natalizio. These were mailed from Miami, Florida, on July 14, 1967, in a plain envelope addressed: "Webb Manuturing [sic], Box 510, Milford, Conn."[3] They were received at that address by Mr. Richard H. Simons, who is the president of Webb Mfg. Co. He is also the defendant's attorney and has been acting as such throughout this entire criminal proceeding.

### Is the confession newly discovered?

Before considering the content of the confession with respect to its materiality or its likely effect in the event of a new trial, the question is whether it is newly discovered, i. e., since the trial.

■ Obviously, the written statement signed by Natalizio in July 1967 stating that he was the man who received the narcotics in Bridgeport on August 22nd and September 21st in 1963 from Caron

---

1. Inquiry about criminal conduct which had not been established by conviction was permitted.

2. Items offered to corroborate the confession are referred to later.

3. It is obvious that the handwriting on the envelope is written by a hand different from that of Natalizio.

is new in its present form. But the substance of it, that Natalizio and not Miller was the Bridgeport member of the conspiracy to whom the deliveries were made, is *not* new. So far as that may be accurate information, both Miller and his attorneys knew about it in 1965, long before the trial.

The affidavit of Mr. Simons states that on January 8, 1965, he again informed the Chief Assistant United States Attorney for the Southern District of Texas "of the facts pointing to Natalizio's guilt and Miller's innocence. . . . ." More to the point, his affidavit continues: "On August 6, 1965, I caused James Miller, under the direct supervision of three private investigators, to confront Natalizio with knowledge of his participation in the transactions at the Bridgeport Motor Inn in August and September, 1963, and to demand that Natalizio provide the defense with the times on which the meetings with Caron occurred . . . .. Miller also asked Natalizio for money for the defense. . . ."

At the hearing on the present motion, the defendant offered a purported transcription of a taped recording of this Miller-Natalizio confrontation.[4] Reading it without reference to the stage business interjected into the script, Miller, wearing a concealed transmitter strapped to his thigh, introduced himself: "My name is Jimmie Miller, you hear—Jimmie Miller. . . . I'm Jimmie Miller the guy who got pinched in place of you in Bridgeport. Do you know now?" Natalizio to Miller: "You're innocent of the whole rap." Then Miller, aware of the fact that Caron had already identified him and had told the authorities the time and

surrounding circumstances of the deliveries of narcotics at Bridgeport, informed Natalizio of this. Miller asked him: "Now think. What time? Just give me the time.[5] That's all I need. And money. Now if you're in trouble, or whatever you're saying, I'm in worse trouble." Natalizio said: "I'm glad you come. Between you and I, I don't sleep. I got you on my mind more than you got yourself on your mind. Whether you realize it or not. Whether you realize it or not, I've got you on my mind until this thing is straightened out. I can't do nothing until I see this thing through."

Thus, as of August 6, 1965, Miller and his attorney admittedly knew and urged the prosecuting authorities to believe that there was evidence that Natalizio should have been cast in the role filled by Miller at the trial. Realizing that this is not newly discovered evidence, the defense argues that a confession made to the defendant is quite a different thing from a written confession. While a written statement may be different in form from an oral one evidencing the same facts, its probative force is not necessarily greater. If anything, the tape record of the conversation between them *prior* to Miller's conviction, monitored as claimed by a reliable investigative agency, would have carried greater weight at the trial than the written confession given after Miller's conviction when there is little likelihood that Natalizio could be convicted.

As further support for his argument that *newness* should be tested by the probative value of the later found evidence, rather than by its subject matter, the defendant's motion alleges several other items to corroborate Nataliz-

---

4. The transcription and tape were marked for identification at the hearing on October 9, 1967. Upon the filing of another affidavit by Mr. Simons on October 16, 1967, attesting to their authenticity the identification limitation was stricken. I have read the transcription, but have not listened to the tape. I do not pass on whether the tape and the transcription are authentic, but it should be

pointed out that Natalizio has recently denied under oath that he made those statements on the transcription which might be construed as self-incriminating.

5. Miller was emphasizing that he was faced with the need for this information for the purpose of limiting the number of witnesses he would need to substantiate his alibi defense.

io's confession. While the corroborative merit of these items are open to serious question, these too are not newly discovered. One item is a written statement signed by Natalizio taken by government investigators on March 26, 1965, in which Natalizio denies that he was in Bridgeport between May 1962 and Christmas 1963. The defendant alleges that this "statement is demonstrably false." Quite apart from the fact that the attack upon the truth of Natalizio's statement rests primarily on hearsay statements made by Louis and Charles Schnee, the disbelief of the statement would provide no basis for concluding that the opposite is true. See Dyer v. MacDougall, 201 F.2d 265 (2d Cir. 1952). As Chief Judge Aldrich observed in Janigan v. Taylor, 344 F.2d 781, 784–785 (1st Cir. 1965), "[w]ere the rule otherwise a case could be made for any proposition in the world by the simple process of calling one's adversary and arguing to the jury that he was not to be believed." Still, the criticism having been made, by using the same standards the defendant himself sets, Natalizio's written confession would not be worthy of belief. But even if that self-contradiction could be regarded as confirmation, cf. United States v. Nuccio, 373 F.2d 168 (2d Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967), it too was not newly discovered.

The motion further alleges that in August of 1967 Natalizio twice orally confirmed the written confessions to two private investigators in the employ of the defense attorney. This bolstering of the confession does not make it any newer. Whatever bearing it may have on whether the "confessions" are true will be discussed later.

The defendant alleges that Natalizio undertook through Charles Schnee to have some registration cards removed from both the Bridgeport and Fairfield Motor Inns in October or November 1963 for dates in August and September. To the extent that there may have been maneuvering at Natalizio's instigation to get some cards from the Bridgeport Motel, Mr. Simons' affidavit [6] discloses that he knew this from Charles Schnee (whose hearsay statements only were offered here) in June of 1965, a year before the trial. It does not become new evidence by having it repeated to an investigator two years later.

There are noticeable infirmities in what Schnee is reported to have said. Nothing developed at the trial indicated that any conspiracy activity occurred at the Fairfield Motor Inn, which Schnee said was one target of Natalizio's card-pulling project. Second, except for an investigator's recent report of an oral admission to him by Natalizio (hearsay again), the proof offered does not indicate that the cards attempted to be removed from the records of the Bridgeport Motor Inn had any relationship to the narcotics transaction.[7] And, third, even if Natalizio had attempted to remove the cards for the fictitious names under which Caron had registered, that might implicate Natalizio, it would not necessarily exonerate Miller. There is some merit to the government's argument that the person who received heroin at the Bridgeport Motor Inn would in all likelihood be the last person to risk discovery of his role by openly expressing an interest in registration cards for the same motel for the very dates in question.

Another allegation is that "the description given by Michael Caron to Government agents on October 16, 1963, of the man to whom he delivered his car in Bridgeport fits Mario Natalizio and does not fit the defendant James Miller." (Defendant's Motion for a New

6. Attorney Simons' affidavit states that in a telephone call to Charles Schnee from his office under subterfuge on June 24, 1965, Schnee admitted he was hired to get cards by "Mario." Two weeks later, Schnee told Simons' office it was not Mario but "Johnny Petella." After the trial, both Schnees allegedly stated that they had been active in a card-pulling episode at Natalizio's instigation.

7. Natalizio denies that the person whose registration card was sought had any relation to the narcotics transaction.

Trial, p. 2, ¶ 7). Neither Natalizio's physical appearance nor Miller's are newly discovered. Caron identified Miller when he saw him prior to trial and he and his wife made an in-court identification of him.

To sum up, Natalizio's confession and the so-called "corroborating items" relating to the central issue that Natalizio rather than Miller was the guilty party were known by the defendant and his attorneys long before trial. While it is newly presented to the court, it is not newly discovered.

*Excuses for failure to use the evidence.*

In a search for escape from the dilemma created by the obvious fact that the defense knew of the evidence of Natalizio's implication prior to the trial, the defendant offers several explanations, but all paths lead to dead ends:

█ 1. The government should be estopped from asserting that the evidence is not newly discovered, because even after the government was permitted to read their transcript of the tape in 1966, it persisted in its claim that Miller was guilty, expressing doubts about the validity of the tape and whether Natalizio had exonerated Miller. This expressed attitude of confidence in Miller's guilt, it is claimed, led the defense to believe that if it offered the tape "the government would counter with some cogent evidence, however false in fact, that Natalizio was not guilty." This explanation is entirely without merit.

█ 2. The government would have objected to the introduction of the tape on the ground of lack of proof of authenticity. If it is authentic, as the defense claims, there is no apparent reason why that could not have been established. In any event, the possibility of an objection by the prosecution is no excuse for failure to litigate the issue.

3. Miller would have had to take the stand to establish that the other voice on the tape was Natalizio's. This would have required him to waive his fifth amendment privilege. The fundamental right not to testify is not in issue here. The privilege is not both a shield and a sword. As stated in Green v. United States, 256 F.2d 483 (1st Cir.), cert. denied, 358 U.S. 854, 79 S.Ct. 83, 3 L.Ed.2d 87 (1958), "It will not do to say that the matter could not have been disclosed at the criminal trial without the personal testimony of Green who, as the criminal defendant, was privileged not to testify. * * * Green cannot have it both ways. He cannot withhold the evidence, gambling on an acquittal without it, and then later, after the gamble fails, present such withheld evidence in a subsequent proceeding under 28 U.S.C. § 2255." (256 F.2d at 484). Cf. Reiss v. United States, 324 F.2d 680 (1st Cir. 1963); United States v. Soblen, 203 F.Supp. 542, 565 (S.D.N.Y.1961), aff'd, 301 F.2d 236 (2d Cir.), cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962); United States v. Di Gregorio, 148 F.Supp. 526 (S.D.N.Y. 1957). Viewed from another side, this was a staged confrontation at Natalizio's residence, not a chance meeting. There were investigators employed by the defense to "wire" Miller for the Miller-Natalizio confrontation, to be in the vicinity at the time, and to receive and transcribe the tape. It is difficult to see why they could not have identified Natalizio as the other party on stage with Miller.

4. Had the tape been offered and excluded, the government would have been able to float adverse innuendo. This requires no comment.

5. Now I come to the fifth and last point of the defendant's explanation why the evidence against Natalizio was not offered. The defendant was advised by counsel that if he offered the tape, revealing that he had been "wired" when he talked to Natalizio, he would incur a substantial risk of being murdered. The defendant does not claim that this was inept advice; on the contrary, the claim is made that "it was good, sound, advice." Whatever facts that advice

may have been based on have not been revealed to the court.[8]

Perhaps the defense was faced with a serious problem of trial strategy.[9] Without claiming to know what it should have done with this evidence, one need have no hesitation in saying that, having made the decision not to offer it at the trial, the defendant cannot now assert that because such evidence still exists, he should have a new trial in order to present it.

### The Repudiated Confessions

Since Rule 33 suggests that the court should be sensitive to any evidence which shows that the original trial resulted in a miscarriage of justice and weigh it carefully against the interest in finality and adherence to procedural requirements, 4 W. Barron, Federal Practice & Procedure § 2281 (Rules ed. 1951), it is advisable, to say the least, that the evidence of a confession by Natalizio on which the defendant relies be considered more fully.

There is little doubt that if Natalizio had testified at the trial to what is contained in his "confession" that might have materially assisted the defense. But further analysis is called for. In sworn testimony on September 6, 1967, at an interrogation by Mr. Newman, the United States Attorney, at which time Natalizio was represented by counsel, and on September 12, 1967, before a Grand Jury, he repudiated the truth of the unsworn, written confessions plus the affidavit of Lane, the investigator who allegedly heard Natalizio confirm the confession. And he denied that he had ever told Miller that he was involved in the conspiracy for which Miller was convicted. About the written confession, he testified that three armed men

stopped him in his car at 3:00 a. m. on July 14, 1967, in North Miami Beach. They took him to two adjoining rooms on the right side of the Sunaqua Motel in Hallendale. They handcuffed one arm and ordered him to write what they told him to or they would kill him. He wrote what they told him to. He denied under oath that what he wrote was true. The affidavit of Mr. Newman discloses that an investigation begun promptly after September 6, 1967, revealed that three men checked into the only two adjoining rooms on the right side of the Sunaqua Motel on July 13, 1967, and paid in advance for three nights. They left on the 14th without asking for a refund. This unusual conduct, coupled with the fact that the person who registered gave the names of his companions at that time as "Mr. Russell" and "Mr. Lewis" which surprised the skeptical motel clerk because she had the impression that all three were of Italian extraction, served to recall the incident for her. She noted that three men as described by Natalizio did take adjoining rooms on July 13th. Fearing that their hasty departure might have been because of damage to the rooms, another employee entered the rooms and noticed ashes and some burnt paper in the wash basin. A further search of the room disclosed a crumpled sheet of paper on which was written in crude handwriting with misspellings what appeared to be the first of several pages of a confession to a crime, mentioning some location up North, most likely in New England. Natalizio had stated to Mr. Newman that he wrote four or five different versions of a confession dictated by the men who were referring to some notes they had before they were satisfied with the version that he had

---

8. I find this logically difficult to reconcile with the claim that Natalizio confessed to relieve his conscience.

9. The defendant also takes the position that by his pre-trial presentation to the government of the fruits of the Miller-Natalizio confrontation the prosecution became obligated to shoulder the entire load of protecting Miller against an erroneous identification. The principle of

Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), cannot be stretched to impose on the prosecution the duty to prepare or present the case for the defendant. See the illuminating opinion of Judge Frankel in United States v. Gleason, 265 F.Supp. 88 (S.D.N.Y.1967). See also United States v. Soblen, 301 F.2d at 242.

written. Perhaps this explains why *two* written confessions,[10] dated July 12th, were sent to Mr. Simons in the same envelope.

Further confirmation of Natalizio's sworn testimony of what happened on the morning of the 14th of July is found in the report of the manager of the apartment where Natalizio lived. He was awakened and asked by Natalizio to be let into his own apartment because he did not have his keys. This incident serves to corroborate Natalizio's testimony that the three men who had him sign a confession at gunpoint retained the keys to his car and apartment after they left him at the motel in the early hours of July 14th.[11]

Natalizio swore that he did not give any true information to Lane, the investigator. While his reasons for agreeing to see and talk with the investigators are a bit confusing, he states that he pretended to cooperate with them because he wanted to learn from them what they knew about other affairs of his related to criminal activities and to get prepared to repay them in kind for the treatment the men who forced him to write the confession had given him. Quite naturally, he associated the investigators with the three men who had forced him to sign the confession. They did not reveal to Natalizio that they were Simons' investigators.

Looking at the confession only in isolation and not to the manner in which it was obtained will not suffice. Viewing the events as a whole, grave doubt is cast upon the worth of the confession as support for this motion.

In a sense, what is proffered in support of the defendant's motion might be regarded as merely cumulative on the issue of identification. The defendant's evidence at the trial that the

Bridgeport contact might have been some other "Frank" was only circumstantial at best. A confession by the true "Frank" would be something quite different. Bearing in mind that in applying the recognized standards to the evidence offered on this motion, the general stricture of Rule 33 that "the court * * * may grant a new trial * * * if required in the interest of justice," I turn to the serious consideration this evidence is entitled to without the limitation that it is merely cumulative. Would it be likely to produce an acquittal?

### Admissibility of the Confession

The confessions are hearsay. The orthodox rule is that a statement by a third person against penal interest is not an exception to the hearsay rule, Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913), but see the vigorous dissent of Holmes, J., at 277, 33 S.Ct. at 461, and the discussion in 5 J. Wigmore, Evidence §§ 1476, 1477 (3d ed. 1940). Model Code of Evidence, rule 509 (1942). This circuit has recently indicated a willingness to re-examine the rule. See United States v. Dovico, 380 F.2d 325 (2d Cir. 1967); United States v. Annunziato, 293 F.2d 373, 378 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961). Assuming, arguendo, that the exception is recognized, the question remains whether Natalizio's statements qualify as being truly against penal interest.

■ "Even a broadened penal interest exception must have some boundaries and must be limited at least to statements admitting a particular crime for which prosecution is possible at the time." United States v. Dovico, 380 F.2d at 327. With Caron's eye-witness identification of Miller so thoroughly tested at the trial, Natalizio would run

---

10. They are in crude handwriting and contain many misspelled simple words.

11. An affidavit of Mr. Simons based upon a report of an investigation since the hearing by his investigators takes issue

with some of the circumstances of the duress related by Natalizio. These are trivial differences as to details. However, they confirm the fact that the Sunaqua Motel episode did occur.

such a remote risk of prosecution, as to be negligible. This he knew, because Lane, the investigator, conceded in his affidavit that he told Natalizio, "he couldn't be convicted with it." And, when Natalizio asked Miller in Florida on August 6, 1965, "How are they going to indict me and indict you? How can that be done to both of us?" Miller answered, "Let me tell you something. If I beat this case you understand? And I've got everything going for me. I'm as clean and innocent as my son. Follow me? If I beat this case and if this is the same case they're pulling on you, where are they going to go with this case." Natalizio: "I don't know." Miller: "Let's be sensible about this thing." Natalizio: "I don't know." Miller: "Do you think that the man that identified me can turn around and say, oh no, it's not him anymore, it's him. I mean, are you for kidding. You got to walk away from it if it's the same case." [12] At that time, Miller apparently assured Natalizio not only that he could never be convicted, but also that he couldn't be indicted for the same apparent offense. If an objective test is applied to determine what is against penal interest some further explication of the confused dialogue between Miller and Natalizio would be necessary to satisfy me insofar as the problem of admissibility is concerned that he made a declaration against penal interest which is referable to this particular case. If the test is subjective, the defendant's brief argues that Miller told Natalizio that he was not going to incriminate him, but merely needed facts about "time" to defend himself. In fact, Miller did not attempt to introduce any evidence at the trial to implicate Natalizio.

■ In any event, the exception for hearsay against penal interest, like any other hearsay exception, is applicable only in the event of the declarant's death or unavailability. Cf. Syracuse Eng'r Co. v. Haight, 97 F.2d 573 (2d Cir. 1938). 5 J. Wigmore, Evidence § 1456 (3d ed. 1940). Natalizio was alive and nothing was offered to show that he would not have been available. While on this motion it is not worth tracing the way Natalizio was discovered on the occasions the defense found him, it is apparent that they were able to get in touch with him quite readily.

### Credibility of the Confession

On the assumption that Natalizio would be produced to testify at a new trial hearsay objections would vanish. And, by laying aside the fact that such testimony he might give is not newly discovered, consideration of that testimony on the merits would be called for.

The defendant argues that in the administration of criminal justice the search for truth is so encompassing that it would be degrading to such an inquiry to impose any restrictions upon the grant of a new trial whenever a defendant comes forward with any evidence not offered at the original trial. There is, of course, more to it than that. To adopt that view without question is to ignore the well established principles of law which require recognition of competing considerations.

■ The broad rule is the same in criminal and civil cases. Of course, there is a difference in presumptions and burden of proof. But in either case the motion is addressed to the discretion of the trial judge. The final test for the granting of a new trial on the basis of newly discovered evidence is whether or not the evidence will "probably produce an acquittal." Brown v. United States, 333 F.2d 723 (2d Cir. 1964); United

---

12. Natalizio denied making any confession at this meeting with Miller. As indicated before, n. 4, I have not passed on the accuracy of the transcript, nor attempted to analyze exactly what Natalizio's end of the conversation meant or what he may have intended it to mean. The government does not concede its accuracy or authenticity. It strikes me as at least curious that Natalizio would have to be forced at gunpoint to sign a confession after Miller had been convicted and lost his appeal, and yet have freely confessed his guilt before Miller went to trial.

States v. On Lee, 201 F.2d 722, 724 (2d Cir.), cert. denied, 345 U.S. 936, 73 S.Ct. 798, 97 L.Ed. 1364 (1953) ; United States v. Rutkin, 208 F.2d 647 (3d Cir. 1953) ; United States v. Johnson, 142 F.2d 588 (7th Cir. 1944), dismissed, 323 U.S. 806, 65 S.Ct. 264, 89 L.Ed. 643 (1944) ; 4 W. Barron, Federal Practice and Procedure § 2282 (Rules ed. 1951) ; 8 J. Moore, Federal Practice, ¶ 33.03 [1] (2d ed. 1966).

**■■■■■** The trial judge sits as the thirteenth juror. Applebaum v. United States, 274 F. 43, 46 (7th Cir. 1921). See also 4 W. Barron, Federal Practice and Procedure § 2281 (Rules ed. 1951). He may "utilize the knowledge he gained from presiding at the trial as well as the showing made on the motion." Brown v. United States, 333 F.2d at 724. The proferred new evidence is not accepted as true; its credibility must be weighed by the trial judge. Thus in Jones v. United States, 279 F.2d 433, 436 (4th Cir.), cert. denied sub nom. Princeler v. United States, 364 U.S. 893, 81 S.Ct. 226, 5 L.Ed.2d 190 (1960), "Where there is a grave question of the credibility of the after-discovered evidence * * * the role of the trial judge is that of the fact-finder, so much so that the Supreme Court has said an appeal from his resolution of the facts should be dismissed as frivolous. [Citing United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946).] The rule has been applied where, as here, a third party confession is the after-discovered evidence upon which the motion for a new trial is found. [Citing Jeffries v. United States, 215 F.2d 225, 15 Alaska 83 (9th Cir. 1954) ; Connelly v. United States, 271 F.2d 333 (8th Cir. 1959).]"

Although all that has been discussed was only preliminary, yet it had to be stated in order that the complex starting point of this polemic be comprehensible and it allows me to anticipate my conclusions.

**■** Only by taking the written confessions of Natalizio in isolation, divorced from any sworn statements he made can it be argued that the confession is credible. If he is believable at all, it would be more reasonable to believe his testimony under oath. Cf. DeBinder v. United States, 112 U.S.App.D.C. 343, 303 F.2d 203 (1962). To say the least, his credibility is doubtful. Obviously he is a person whom a jury would not believe.

So without again running through the scenes when the two confessions were written by Natalizio in 1967, the whole performance is too lunatic not to awaken the utmost skepticism. Here the defense has submitted two versions of a confession written at the same sitting plus the testimony and affidavit of an investigator to whom Natalizio allegedly confirmed them. The defense did not produce the alleged confessor, although Mr. Newman's affidavit discloses that they had ample opportunity to subpoena him. They claim that motions such as this are usually decided solely on the basis of affidavits. That method is permissible. United States v. Johnson, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946) ; 8 J. Moore, Federal Practice ¶ 33.03 [3] (2d ed. 1966). See also United States v. Troche, 213 F.2d 401, 403 (2d Cir. 1954) ; United States v. On Lee, 2 Cir., 201 F.2d 722.

Natalizio has not sworn to his confession. The hypothesis that his confession was "spontaneous" is so unlikely as to be almost discarded "ab initio." Furthermore, he has repudiated it. He did so twice, once by sworn testimony before the United States Attorney, when he was accompanied by his counsel, and again before the Grand Jury, when he was not. The compulsion to speak the truth may indeed sometimes be induced by ethics, but it rests on a more solid foundation when spoken under the risk of prosecution for perjury. Weighed with those considerations in mind, I am wholly satisfied that the written confessions were

obtained by duress. A threat of murder at the point of a gun no doubt is most extreme, but viewed in connection with traffic in narcotics on the scale conducted by this conspiracy, see Rivard v. United States, 375 F.2d 882 (5th Cir. 1967), it is not unlikely. It easily constituted such duress as to invalidate the confessions. Disbelief of the confessions of Natalizio can be deepened by exploring the testimony at the trial a little further. At the trial Caron not only identified Miller, he also quoted Rivard as saying that the man Frankie to whom delivery had been made in Bridgeport was his friend Frankie and a "hair dresser." The defense now argues that it is unlikely that Rivard would attempt to conceal the identity of Miller from Caron by calling Miller "Frankie" yet reveal it by referring to his occupation. "If Rivard made the statement, therefore it was a lie," they say. Viewing it from the aspect of one person further removed, it would be a most amazing piece of perjury for *Caron* to concoct by himself that James Miller was "Frankie" and a hair dresser. In point of fact, Miller had used the name Frank in connection with earlier criminal activities. His fingerprints were on a police record bearing his photograph and the name and signature of Frank—Coppola. And he is a hair dresser, who is the owner and operator of a beauty shop in Milford near Bridgeport, Connecticut. The reference by Rivard to Frankie, the hair dresser, knocks out the hypothesis that it was Natalizio. Natalizio was never known as, never used the name of, and never was called "Frank."

Miller had a fair trial. Despite the prolonged and thorough attack upon Caron's identification of Miller, the jurors were satisfied of his guilt.

The evidence in support of the motion for a new trial is not newly discovered. Even if it would not amount to a circumvention of the rules to disregard that, it is my conclusion that the evidence would not probably produce an acquittal.

The motion for a new trial is denied.