John R. Carkhuff and Rosemary W. Carkhuff v. Commissioner.
Carkhuff v. Commissioner
Docket No. 1863-67.
United States Tax Court
T.C. Memo 1969-66; 1969 Tax Ct. Memo LEXIS 230; 28 T.C.M. (CCH) 375; T.C.M. (RIA) 69066; April 8, 1969, Filed Oakley V. Andrews, 1956 Union Commerce Bldg., Cleveland, Ohio, for the petitioners. J. E. Friedland, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar years 1962 to 1964, inclusive, in the following *231 amounts: Year
Deficiency
1962
$3,130.07
1963
318.46
1964
5,719.25
The issue for decision is whether petitioners are entitled to deduct expenses incurred and depreciation sustained for 8 376 months of each of the years here in issue with respect to their property located at Sea Island, Georgia, in amounts in excess of total rental income received in each such year. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners, John R. Carkhuff and Rosemary W. Carkhuff, husband and wife, resided in Akron, Ohio, at the time of the filing of the petition in this case. They filed joint Federal income tax returns for the calendar years 1962, 1963, and 1964 with the district director of internal revenue at Cleveland, Ohio. In the latter part of 1956, petitioners purchased residential property on Sea Island, Georgia, consisting of seven contiguous parcels of land. The property which fronted on the Atlantic Ocean held a house containing four bedrooms each with bath, a two-storied living room, a dining room, pantry, kitchen, bar storage closet, sun deck and terrace, servants' quarters consisting of two additional bedrooms *232 with bath, and a three-car garage. The fair market value of the property, excluding furnishings, as of April 1968, was approximately $200,000 of which approximately $125,000 would be applicable to the land. There was an increase in property values at Sea Island between 1956 and 1958. Petitioners in computing depreciation on the Sea Island property allocated $79,153.87 of the purchase price they paid for the property to the house. Sea Island is located off the east coast of Georgia and is approximately 5 miles long, 1 mile wide, and 10 miles from the mainland city of Brunswick, Georgia. The island which is operated as a privately owned resort attracts a substantial number of people annually for the 10 months from February through November. The Sea Island Company owns the Cloisters Hotel, the only hotel facility on the Island, and provides most of the resort facilities which include a 27-hole golf course, [1] a beach club with swimming pool, 5 miles of private beach, riding stables, tennis courts, and other recreational facilities. All the recreational facilities are open to cottage owners subscribing to the Sea Island Cottage Club, and to those people to whom cottages are rented through *233 the facilities of the Rental Department maintained by the Sea Island Company. Approximately one-half of the houses on Sea Island are available at various periods for rent, and that percentage has been the historical experience on the island. The Rental Department of the Sea Island Company (hereinafter referred to as the Rental Department) was and is the exclusive rental agent for petitioners' property and handles all rental details relating to the property on behalf of petitioners. Under petitioners' agreement with the Rental Department petitioners were not prohibited from personally renting their property. However, personal rental by petitioners was not practical since had they personally rented their property, the tenants would have been required to pay fees at a higher rate than the club fee for use of certain of the facilities at Sea Island, would not have had use of other facilities, and would have had use of the dining facilities at the Cloisters Hotel only on the same basis as any transient not registered at the hotel who came to Sea Island. *234 Advertising of Sea Island as a whole is regularly placed by the Sea Island Company in various media and in pamphlets which it distributes. All such advertisements list the services and facilities available. Although most of the advertisements mention the availability of private cottages for rental, they do not give specific details as to any of the cottages so offered. Petitioners' cottage is not advertised individually and specific information relating to the petitioners' cottage is furnished by the Rental Department only when a prospective tenant indicates his need for a cottage of the general description of petitioners' property. In some instances a brochure which petitioners had prepared with respect to their cottage is furnished by the Rental Department to a person who has made inquiry with respect to cottage rentals. Soon after purchase of the property petitioners listed their house with the Rental Department. In each of the years here in issue the property has been expressly reserved for the use of petitioners during the months of February, March, April, and October, and has been generally listed with the Rental Department as available for rental for the other 8 months of *235 the year. During the years that petitioners have owned the 377 property it has been in fact rented only during the following months: Year
Months rented
1957
July
1958
June, July and August
1959
July
1960
August (September - one week)
1961
July
1962
June, July, August
1963
July, August
1964
None
1965
None
1966
None
1967
None
1968
None
The monthly rental rate on the property has been steadily maintained at $1,300 per month, which was a reasonable rental for the property when it was originally listed with the Rental Department. As a general rule the property has not been offered for periods of less than one month, occupancy has been limited to eight persons and no pets have been permitted. The rental agreements provided for a 15 percent commission on rentals received to be paid to the Rental Department and also provided that the cottage would not be removed from the list of houses available for rental, nor occupied unexpectedly by the owner, or friends, until the owner has contacted the Rental Department to see if the house has been previously rented for conflicting periods. There are two peak rental periods for the cottages at Sea Island *236 - March through April and mid-June through August. There is also a period from April to mid-June during which the rental cottages are generally available and there is some rental. From September through February the cottages in the area are generally occupied by the owners and demand for rentals drops off substantially but there are occasionally rentals during this period. December and January are months when the resort is least popular with nonresident vacationers. Petitioners' cottage was outfitted with stainless steel counters and Formica table tops which are desirable for rental purposes and had vinyl floors suitable for the type of use which would be derived from rental occupancy. In 1962 the cottage was to some extent refurbished by petitioners after the Rental Department had a survey of the house made to determine the equipment and furnishings which needed reconditioning or replacement. The survey was generated by the complaints of a tenant in the summer of 1962. There has been a trend on Sea Island for the newer cottages to have air conditioning built in, and for the older ones to be adapted for air conditioning to meet an increasing demand from renters and the Rental Department *237 suggested that petitioners' house be air conditioned. However, the petitioners' house was not air conditioned. It was not adaptable to air conditioning with the expenditure of substantial sums of money. Because of lack of air conditioning petitioners' cottage has become less desirable during the summer months in relation to other cottages available in the eyes of the renting public that frequents Sea Island. During the years here in issue petitioners reported dividend income in each year ranging from approximately $226,000 to $254,000, which dividends were the primary source of income reported by petitioners. On their income tax returns for the years 1962, 1963, and 1964, petitioners reported receipts from rental of their Sea Island property and claimed deductions for expenses and depreciation with respect thereto in the following amounts resulting in claimed losses with respect to the property as indicated: Year
ReceiptsReported
Depreciation DeductionClaimed
ExpenseDeduc- tionClaimed
Resulting Loss
1962
$3,600.00
$4,106.49
$3,406.11
$3,912.60
1 963
2,400.00
4,188.21
3,299.84
5,088.05
1964
0
4,292.12
3,203.68
7,495.80
The expenses *238 claimed by petitioners as deductions with respect to their Sea Island property did not include the real estate taxes attributable to the property. These taxes, in the amounts of $1,428 for each of the years 1962 and 1963, and $1,367.07 for 1964, were separately claimed as deductions in each of the respective years. Respondent in his notice of deficiency disallowed petitioners' claimed "Rental loss" in the amounts of $3,912.60, $5,088.05 and $7,495.80 for the years 1962, 1963 and 1964, respectively, with the explanation for each year that petitioners had "not established that the property was acquired or is operated with the reasonable expectation or 378 purpose of realizing a profit, and because the property was acquired and is used primarily for personal reasons." Petitioners alleged in their petition that although the deductions claimed by them on their Federal income tax returns for the years here in issue were on the basis of onehalf the depreciation and operating expenses of the Sea Island property the proper amount of deductions claimed should have been on the basis of two-thirds of the annual operating expenses and depreciation sustained. Petitioners alleged that their *239 tax liabilities for the years here in issue should be determined by increasing their claimed loss with respect to their Sea Island property accordingly. Opinion The primary issue in this case is whether petitioners are entitled to deduct expenses and depreciation attributable to their Sea Island property during the period in the years at issue that the property was available for rental. Disposition of the case depends upon whether the holding out of the property for rental purposes by the petitioners constitutes a trade or business or holding of property for the production of income within the purview of sections 162 and 212, I.R.C. 1954. [2] That holding a single property for rent may constitute a trade or business has long been recognized by this Court. Anders I. Lagreide, 23 T.C. 508, 512 (1954) and cases there cited. We have also recognized that property held for rental purposes may be held for the production of income within the provisions of section 212. William C. Horrmann, 17 T.C. 903 (1951). See also Jones v. United States, 279 F. Supp. 772 (D. Del., 1968). In determining whether the holding of a property *240 for rental is a trade or business of the taxpayer within the meaning of section 162 or is a holding of the property for the production of income within the meaning of section 212, the intention of the taxpayer as to the use of the property is of paramount importance. A long line of cases has laid down the rule that the intention of the taxpayer to make a profit from the transactions or activities claimed to constitute a trade or business is a necessary prerequisite to such transactions or activities being considered to constitute a trade or business. Schley v. Commissioner, 375 F. 2d 747 (C.A. 4, 1967) affirming a Memorandum Opinion of this Court; Lamont v. Commissioner, 339 F. 2d 377, 380 (C.A. 2, 1964) affirming a Memorandum Opinion of this Court and cases there cited. In the instant case there is no evidence that petitioners had any intention of making a profit from the rental of their Sea Island property. In fact there is no evidence of the intentions of petitioners in listing the property for rent when they were not occupying it and the reasonable inference *241 from this record is that petitioners' listing for rental of the property was in the hope of recouping some of the costs of maintaining a personal residence which they did not intend to occupy for the entire year. See Ernest H. Martin, 50 T.C. 341, 364 (1968). The only witnesses in this case who testified as to matters other than accounting procedures used with respect to computation and the physical layout of the Sea Island property were the vice president of the Sea Island Company and the head of the Rental Department. Both of these witnesses joined the company in 1958 and had no personal knowledge as to the purchase of the Sea Island property by petitioners or the circumstances under which it was originally listed for rent. The vice president of the Sea Island Company stated that since he had been connected with the Sea Island Company discussions with respect to rental of houses during sales negotiations were generally with reference to bringing "in some revenue that will help to carry the operating expenses of the house." Petitioners have failed to establish that they offered their Sea Island property for rental for certain periods of the year with the intention of *242 making a profit as distinguished from helping to carry a part of the operating expenses of a personal residence. There are many indications that petitioners did not have a profit making intention. One such indication is the months during which the house was offered for rent and another the failure of petitioners to air condition the house. Other facts indicating a lack of profit making intention will be more fully discussed hereinafter. Petitioners take the position that since they acquired the house partially for personal use and partially for "business" use, 379 it is immaterial whether there was any reasonable expectation of making a profit from the "business" use of the house. The short answer to petitioners' argument is that this record is totally devoid of evidence as to why petitioners acquired their Sea Island property and as to their intentions with respect to its use when they acquired it. There is nothing in this record to show whether petitioners had any business purpose in mind when they acquired the property. All that the record shows is that petitioners acquired the property in 1956, the property was rented one month in 1957 and beginning in 1958 it was offered *243 for rent for certain months of the year. Petitioners deny that any question of conversion of personal property to an income producing use is involved herein. However, since petitioners have failed to show that they acquired the Sea Island property for business purposes or for the production of income they must show a conversion of the property to one of such purposes to be entitled to the deductions they claim. Petitioners contend that the mere fact that the house was offered for rental in certain months of the year proves that the property was "held for the production of income" at least during these months. They argue that the showing of any intention to make a profit from the rental is unnecessary. In Margit Sigray Bessenyey, 45 T.C. 261 (1965) aff'd 379 F. 2d 252 (C.A. 2, 1967) we stated that for an operation to be for the production of income under section 212(1) it is necessary that such operation be conducted for the purpose of making a profit. The operation involved in the Bessenyey case was the raising of Hungarian half-bred horses. There are certain cases that indicate that a profit motive is not necessary in order for expenses incurred in *244 connection with property "held for the production of income" to be deductible under section 212(2). See William C. Horrmann, supra, and Hartford v. United States, 265 F. Supp. 86 (W.D. Wis., 1967). The latter case allowed a deduction for depreciation, insurance, and other expenses in connection with real property leased to a private club at a rental that precluded any net profit. See also Briley v. United States, 298 F. 2d 161 (C.A. 6, 1962). In the cases which allowed the deduction of expenses in connection with property held for the production of income under circumstances which indicate that the obtaining of any net income from the property in the foreseeable future was extremely unlikely, the facts showed that the property was either originally acquired for or irrevocably converted to a rental or sale usage. Therefore, the discussion in those cases of the necessity of a profit motive is inapplicable to this case unless petitioners have shown that there was a bona fide conversion of their Sea Island property to an income-producing use. See Jones v. United States, supra. In considering the question the possibility of profit would *245 be a factor, but only a factor, to be weighed with other objective factors incident to the transaction to determine the petitioners' intent. Respondent raises the question whether there can be a conversion to income-producing property for certain months of the year of property admittedly held for personal use during the remaining months. We need not determine this issue since in our view this record fails to show any actual conversion of petitioners' property to "property held for the production of income" for any particular period of time when the property was not actually rented during any of the years here in issue. In determining whether there has been a bona fide conversion of petitioners' Sea Island property we are left in this case to pick our way through a fog of missing factors. The petitioners have shown only that they listed the property with the Sea Island Rental Department as available for rent generally for the same 8 months each year, and held it for their own use the same 4 months each year and that the cottage rental department attempts to rent the cottages in a business like manner, and one consistent with the location and use of the property. The petitioners *246 held the property out for rental during one of the two peak rental seasons and also held it out for rent during a period when most of the private home owners were in residence but there were occasional rentals of property. Even if fully rented for the period and at the rental at which offered the property would not have returned an amount equal to depreciation, taxes and the cost of operation, although it would have returned an amount in excess of direct operating expenses. Although the property has increased in value, there is no evidence that petitioners have ever intended to dispose of the property after future increase in value. Thus 380 the property cannot at any time be said to have been held as an investment. During the years in issue the property was rented for a total of 5 months, all of which were during one of the two peak rental periods of the area. During petitioners' entire prior holding period of the property it had been rented for only one week outside of the peak rental months. Petitioners, themselves, have utilized the property each year during two of the five months which make up the peak rental seasons. The property had a rental history during the five years *247 prior to the years here in issue that it had been held by the petitioners of renting only about one-sixth of the period in which it was offered for rent. The property was less suitable during the years here in issue, and has thereafter continued to remain less suitable for the income-producing purpose claimed for it than it was when it was acquired. Its competitive position has deteriorated steadily because of the lack of air conditioning; yet petitioners have made no substantial efforts to increase the attractiveness of the property as a rental cottage. Although there has been no evidence regarding the number of persons requiring a cottage such as petitioners, it is a reasonable assumption that the number is limited, especially in light of the rental history of the property. The record shows that petitioners were entitled during the periods the property was held out for rent to use the property themselves if it had not been previously rented and the Rental Department were notified of the intended use by petitioners. The record contains no evidence as to the amount of actual use of the property made by petitioners during the periods it was offered for rent. The representatives of *248 the Sea Island Company knew petitioners had the right to use the property upon proper notification to them but did not know the extent to which petitioners actually did use the property during the periods it was offered for rent. We must therefore conclude that the petitioners not only might have made personal use of the property during the periods it was offered for rent but that they have to some extent done so. Where there is a possibility of personal use of a property originally acquired for personal use, a conversion has not been accomplished until the property is actually rented. See Warren Leslie, Sr., 6 T.C. 488 (1946). After the actual rental of the property in each year here in issue there is no evidence of whether there was a reconversion to petitioners' private use until October when they personally reoccupied the property as a residence. However, for the years 1962 and 1963 this was a period of only one month and we cannot assume without proof that petitioners did not personally use the property during this month. In 1964 the cottage was not rented at all and therefore there is no question in this year of an actual rental converting the property to rental *249 property. While we recognize that homes of the type of petitioners may be held for production of income, the evidence in this case indicates that there was no bona fide intention by petitioners to use their property primarily for income production purposes except for the period it was actually rented There was no sufficient conversion of the property to any use which, under all the circumstances of this case, can be said to have been primarily for the production of income. Respondent has not disallowed all the deductions claimed by petitioners with respect to their Sea Island property but only the losses resulting from the excess of the deductions over income. Therefore, we need not decide whether property may be converted to an income producing use for a part of a taxable year, and then reconverted to personal use for the remainder of that taxable year, in a recurring pattern. Even if we assume, without deciding, that such temporally recurring partial-conversion pattern would be sufficient to cause the property to be property held for the production of income during a portion of a year, petitioners have not met their burden of proof of showing facts supporting such a conversion *250 and have not shown that there was any primary motive to produce income for the full year absent such a conversion. Decision will be entered for respondent. 381 Footnotes
1. The evidence indicates that as of 1956 the golf course consisted of 18 holes and that 9 additional holes were added in 1959.↩
2. All references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩